[This opinion has been published in *Ohio Official Reports* at 82 Ohio St.3d 123.]

THE STATE OF OHIO, APPELLEE, *v.* GOFF, APPELLANT.

[Cite as *State v. Goff*, 1998-Ohio-369.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 97-1130—Submitted March 3, 1998—Decided June 17, 1998.)

APPEAL from the Court of Appeals for Clinton County, No. CA95-09-026.

————————————

{¶ 1} Appellant, James R. Goff, convicted of the aggravated murder of Myrtle Rutledge, appeals his convictions and death sentence.

{¶ 2} Rutledge, an eighty-eight-year-old woman, was in the process of moving out of her old farmhouse and into a new doublewide trailer home that was built directly behind the farmhouse. Her daughter, Esther Crownover, had been helping her sort out items from the old house, in which she had lived for forty-seven years.

{¶ 3} Rutledge decided to purchase some new furniture for her new house, and on September 14, 1994, she and Crownover went to Butler Home Furnishings in Wilmington, Ohio. After purchasing a new mattress, box springs, chair, ottoman, and sofa, Rutledge made arrangements for the furniture to be delivered the next day.

{¶ 4} Butler Home Furnishings had employed appellant for furniture deliveries for about a year. Harold E. Butler, Jr., the son of the owner, would contact appellant when he had a delivery and then, depending on the item, would get another person to assist appellant with the delivery. Butler Furnishings had also used Manuel Jackson as a delivery person for the seven months prior to September 1994.

{¶ 5} Appellant and Jackson were contacted to make the delivery to Rutledge on September 15, 1994. When appellant and Jackson arrived with the

furniture, Rutledge directed them to put the new furniture in the new house. Since there was no bed frame in the new house, appellant asked whether Rutledge wanted them to obtain the frame from the old house and assemble the bed in the new house. After they indicated that they would not charge Rutledge any additional money for this service, Rutledge took them into the old house, up to the second floor, and pointed out the bed frame that was to be used with the new bedding. The old house was in a state of disarray from the ongoing moving process. Jackson thought he saw appellant "snooping" through Rutledge's belongings.

{¶ 6} Appellant and Jackson disassembled the old bed, took the frame to the new house, and set up the new bed. While Jackson finished the assembly, appellant obtained Rutledge's signature on the delivery form.

{¶ 7} Later that afternoon, Rodney Rutledge, the victim's son, arrived at his mother's house around 4:00 p.m. to mow the lawn. She showed him her new furnishings that had been delivered that day. When he left (around 5:30 p.m.), his mother's car was parked in the driveway next to the house.

{¶ 8} On the night of September 15, Myrtle Rutledge spoke on the telephone to her sister (6:30-7:00 p.m.) and her sister-in-law (around 9:00 p.m.) concerning the upcoming family reunion on Saturday, September 17. On Friday, September 16, 1994, Rutledge's son drove past his mother's house six different times during the course of his employment. Each time his mother's car was not parked in the driveway next to the house. Rutledge's sister also drove past the house and noticed the car was not there.

{¶ 9} On Saturday morning, Crownover went to Rutledge's home to pick her up for the reunion. The car was not there, and when her mother did not answer the door, Crownover assumed that she had already left for the reunion. When she arrived at the reunion her mother was not there. She went back to her mother's house, entered, and went upstairs to her mother's bedroom. There she found her mother's battered and naked body lying on the floor of the bedroom. A pool of

blood was on the bed, as well as the floor area. After ascertaining that there was no pulse, she tried using the phone to call the police, but there was no dial tone. She covered her mother with a blanket and drove to the police station.

{¶ 10} The police and an ambulance were dispatched. Once it was determined that Rutledge was dead, the police secured the scene and began a criminal investigation. Deputy Sheriff Fred W. Moeller, the crime scene investigator, determined that the door to the victim's house had been forced open. Someone had apparently tried to enter the home through a window, because the window screen was lying on the ground outside the house, but entry was not made though the window. The phone wires on the outside of the house were cut.

{¶ 11} No fingerprints were found in the bedroom. In Moeller's opinion, the room had been cleaned. Other fingerprint smudges were found in the house, but never matched. There was no evidence of blood anywhere else in the house except the bedroom. Denise K. Rankin, a serologist, identified a pubic hair found at the scene as being consistent with a pubic hair obtained from appellant after his arrest.

{¶ 12} After Moeller left the scene to return to the police station, he was notified that the victim's car was found on North High Street in the city of Wilmington. He went to the scene, and the keys to the car were found on the floor on the driver's side. A pink towel was on the front seat of the car, and no prints were found anywhere on the car. Moeller believed that someone had wiped down the car.

{¶ 13} The deputy coroner testified that Rutledge died from blunt and sharp trauma to the head, neck, shoulders, and ankle. Her death also resulted from blood loss due to multiple stab wounds, one of which severed the carotid artery. The coroner was unable to determine the time of death.

{¶ 14} When appellant and Jackson left Rutledge's house after delivering the furniture on September 15, they purchased some crack cocaine and went to

appellant's house to smoke it. Appellant later returned the truck to the furniture store.

{¶ 15} Jackson did not see appellant again until 1:00-1:30 a.m. the following morning when he saw him running through an alley. Jackson later saw him on Grant Street. Appellant had changed his clothes from earlier in the day when they had delivered the furniture.

{¶ 16} Appellant asked Jackson whether he wanted to smoke some crack, showing him what Jackson thought was about $80 worth of crack. Jackson was with Tim Bart, and all three proceeded to appellant's house. After they smoked the crack, which took a couple of hours, Bart suggested stealing some meat to trade for more crack. They were going to walk to the store, when appellant indicated he knew where there was a car they could use, but it was stolen. Appellant said the car was on North High Street. Bart and Jackson opted not to use the stolen car, and they walked to Bob and Carl's Meat Store. Bart stole the meat, and he and appellant "took off."

{¶ 17} Jackson saw appellant around noon the next day, and appellant asked him to tell anyone who asked, that he (appellant) had been with Jackson from 9:00 p.m. on September 15 until 3:00 a.m. on September 16.

{¶ 18} Later, on September 17, Timothy Shaffer found appellant playing pool at a game room in Wilmington. Appellant, Shaffer, and David Walls ended up at Shaffer's trailer, where they smoked three to four "joints." All three left the trailer and went to buy some crack. After the purchase, Shaffer and appellant went to appellant's house to smoke the crack. Appellant wanted Shaffer to sign a note saying that he (Shaffer) helped in a crime committed on September 15, but Shaffer refused to sign. Appellant went and stayed at Shaffer's trailer until September 21.

{¶ 19} While staying with Shaffer, appellant talked with him about Rutledge's death. Appellant asked Shaffer what he would do if he killed someone. Appellant then told him he stabbed a lady and bent the blade of the knife. He also

choked her. Appellant then told Shaffer he took her car and left it in front of the Mulberry Hill Apartments. After wiping the steering wheel, he drove the car to North High Street, where he left it, and then bought about $90 worth of crack and smoked it. Appellant admitted that he went to Rutledge's house to rob her.

{¶ 20} On September 21, Shaffer saw a newspaper article about the Rutledge murder and asked appellant to leave his trailer. About two weeks later, Shaffer received a letter from appellant telling him that his (appellant's) life was in Shaffer's hands and to not tell anyone. Shaffer eventually called Colonel Tim Smith at the sheriff's department, and turned over a pair of tennis shoes and a laundry basket belonging to appellant. Shaffer ultimately told Smith all of what appellant had said about the murder.

{¶ 21} Appellant was arrested on September 21, 1994 on a drug charge. During the interrogation, appellant admitted that he had a crack habit, that he bought crack whenever he could, and that he would steal and trade items to buy crack. He indicated that he delivered furniture to the Rutledge residence, but when questioned about the murder, appellant asked for an attorney and questioning ceased.

{¶ 22} The state also presented three inmates, Jerry Lee Price, Danny Smith, and Keith Jones, to testify to various statements appellant had made to them regarding the Rutledge crime while incarcerated on the drug charge. Smith's testimony was excluded, since he failed to identify appellant in court; however, both Price and Jones testified regarding the murder.

{¶ 23} Jones's testimony was by far the most damaging. Appellant told Jones that he had delivered furniture to an old lady in her late 80's. She had given appellant some money when he put the new bed together and later that night he went back to get the rest of the money he saw she had. Appellant entered through the kitchen and found Rutledge in the bedroom. Appellant told him that Rutledge called him "Jimmy," so he "had to get rid of the bitch." Jones asked him questions

concerning the crime because Jones could not believe appellant could do such a thing to an old woman. Appellant asserted that she had lived her life, and since she could send him to prison, he had to kill her. After he took the money and the car, he went and bought crack. Appellant ran into a friend and they went and smoked it. Appellant said he killed her by himself, using a fishing tackle knife from his house. He told Jones they would never find the knife because he got rid of it. Jones wrote a letter to the prosecutor's office, although he was not sure he believed appellant, but that he (Jones) had an elderly mother and could not think of something like that happening to her.

{¶ 24} Appellant was indicted in January 1995 with alternate counts of capital aggravated murder of Myrtle Rutledge. He was also charged with aggravated robbery, aggravated burglary, and grand theft of a motor vehicle. The jury found him guilty of eight of the counts and not guilty of one of the grand theft counts.

{¶ 25} Four witnesses testified on appellant's behalf during the penalty phase. The jury recommended the death penalty on both counts. After the state elected the first count for sentencing, the trial court sentenced appellant to death. The court of appeals affirmed the convictions and sentences, including the death sentence.

{¶ 26} The cause is now before this court upon an appeal as of right.

_____

*Gary W. Crim* and *Luigia Tenuta*, for appellant.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 27} In this appeal, appellant has raised eleven propositions of law. Finding none meritorious, we affirm his convictions. In addition, we have independently reviewed the record, weighed the aggravating circumstance against

the mitigating factors, and examined the proportionality of the death sentence in this case to the penalty imposed in similar cases. Upon a complete review of the record, we affirm appellant's convictions and sentences.

I

Penalty Phase Jury Instructions

**{¶ 28}** Appellant's first proposition of law includes fifteen subsections challenging the penalty-phase instructions. All but one of the challenges were preserved in the trial court and in the court of appeals. See *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph one of the syllabus.

**{¶ 29}** While it is prejudicial error to refuse a requested charge that correctly states the law and is not covered by the general charge, the charge need not be given in the exact language requested. See *State v. Hicks* (1989), 43 Ohio St.3d 72, 77, 538 N.E.2d 1030, 1037.

A. Jury's Discretion Must be Channeled

**{¶ 30}** Appellant makes a generalized claim that the trial court's instructions to the jury failed to channel the jury's discretion and thereby resulted in the arbitrary imposition of the death penalty in this case. However, the instructions given to the jury were not incorrect, nor did they fail to guide the jury in its decision-making process.

B. Instruction that Sole Juror May Prevent the Imposition of Death

**{¶ 31}** Appellant requested that the jury be instructed:

"If you are unable to agree unanimously that a death sentence is appropriate under this standard of proof, you are to proceed to consider which of the life sentence verdicts (recommendations) to return.

"You are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences."

**{¶ 32}** The trial court denied the request and instead instructed the jury:

"You shall recommend death only if you unanimously find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. if [*sic*] you do not so find, you shall unanimously sign a verdict for either a sentence of life with parole eligibility after serving 20 full years of imprisonment or a sentence of life with parole eligibility after serving 30 full years of imprisonment."

{¶ 33} Appellant now argues that the jury could infer through this instruction that it must unanimously find that the death sentence was inappropriate before considering a life sentence. In addition, appellant argues that this instruction failed to inform the jurors what to do if they could not reach a unanimous agreement on life or death. Appellant relies on our decision in *State v. Brooks* (1996), 75 Ohio St.3d 148, 159-162, 661 N.E.2d 1030, 1040-1042.

{¶ 34} We stated in *Brooks*, "In Ohio a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors *from this point forward* should be so instructed." (Emphasis added.) *Id*. at 162, 661 N.E.2d at 1042. However, *Brooks* was decided on March 4, 1996, six months *after* appellant was tried. Further, the jury here did not receive the erroneous instruction that served as the basis for the reversal in *Brooks*.

{¶ 35} The jury was informed that it must be unanimous in finding that the aggravating circumstances outweighed the mitigating factors. The jury was also informed that if it did not make that unanimous finding, one of the life verdicts "shall [be found]." Again, it would be preferable to include the missing piece, that the jury does not have to unanimously find that the aggravating circumstances do not outweigh the mitigating factors before considering the life sentence options. Yet, the "substance" of what the jury must determine was included in the charge given; therefore, appellant was not prejudiced.

C. Instruction on Unanimity on Mitigating Factors

**{¶ 36}** Appellant argues that the trial court should have instructed the jury that it did not have to unanimously agree on each mitigating factor before it could be considered in the weighing process. Here, the trial court instructed, "In making your decision you will consider all the evidence * * * [m]itigating factors must be considered collectively when they are weighed against the aggravating circumstances." The jury was never told that it had to make a unanimous finding on the individual factors before weighing them. The trial court did not err in overruling appellant's request.

### D. Miscellaneous Mitigation Requests

**{¶ 37}** In subsections D-F, H-K, and M, appellant alleges that the trial court, despite requests, failed to expound on what is an aggravating circumstance, failed to define "mitigation" for the jury, or give specific instructions concerning mitigating factors set forth by the defense.

**{¶ 38}** In subsections (F) and (I), appellant had requested that the court instruct, with more specificity, regarding the aggravating circumstances and weighing process. However, the court correctly identified the aggravating circumstances, and the process of weighing the aggravating circumstances against the mitigating factors. Therefore, the requests were, at least in substance, in the court's charge to the jury. See *Hicks*, 43 Ohio St.3d at 77, 538 N.E.2d at 1037.

**{¶ 39}** In subsection (D), appellant argues the trial court failed to define "mitigating evidence" as set forth in *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831. In *Holloway*, the court explained that "mitigating factors under R.C. 2929.04(B) are not related to a defendant's culpability but, rather, are those factors that are relevant to the issue of whether a defendant convicted under R.C. 2903.01 should be sentenced to death." *Id*. at 242, 527 N.E.2d at 835. See, also, *State v. Lawrence* (1989), 44 Ohio St.3d 24, 28-29, 541 N.E.2d 451, 457. Here, no specific instruction defining "mitigation" was given.

**{¶ 40}** The trial court's failure to define "mitigation" for the jury does not constitute prejudicial error. The trial court defined what factors the jury was to consider, and implicit in the trial court's instruction was that the factors set forth by the defense were factors relevant to whether appellant should be sentenced to death.

**{¶ 41}** In the remaining subsections (E, H, J, K, M), appellant argues the trial court erred in refusing to instruct the jury on specific mitigating factors raised by the evidence in the penalty phase. A sentencing authority may not "refuse to consider, as a matter of law, any relevant mitigating evidence." *Eddings v. Oklahoma* (1982), 455 U.S. 104, 113-114, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1, 10-11. Here, the trial court never restricted the jury from considering appellant's evidence as a mitigating factor. The court instructed:

"In making your decision you will consider all the evidence, the arguments of counsel, and all other information and all other reports which are relevant to the nature and circumstances of the aggravating circumstances or to any mitigating factors including, but not limited to, the nature and circumstances of the offense, and 1) the history and character and background of the Defendant, 2) the youth of the Defendant, and 3) any other factors that are relevant to the issue of whether the Defendant should be sentenced to death."

**{¶ 42}** Thus, the jury was allowed to consider *all* the mitigation evidence and was not precluded from considering any evidence as mitigating. The trial court need not specifically instruct that particular evidence is mitigating, nor are comments by the court on evidence generally appropriate. In *State v. Landrum* (1990), 53 Ohio St.3d 107, 122, 559 N.E.2d 710, 727-728, we held that a trial judge did not err by simply following the statutory language and declining to instruct that particular evidence was a specific mitigating factor.

**{¶ 43}** The United States Supreme Court recently addressed these issues, including the failure to define mitigation, in *Buchanan v. Angelone* (1998), 522 U.S. ___, ___, 118 S.Ct. 757, 762, 139 L.Ed.2d 702, 711, holding that the absence

of instructions on the concept of mitigation and on particular statutorily defined mitigating factors does not violate the Eighth and Fourteenth Amendments. An important factor in the court's decision was its belief that the jury, after hearing two days of testimony relating to the petitioner's family background and mental and emotional problems, as well as arguments from both sides on mitigating evidence and its effect, would be unlikely to disregard that evidence in making its determination. See *id*., 522 U.S. at ___, 118 S.Ct. at 762, 139 L.Ed.2d at 711.

**{¶ 44}** Buchanan, like appellant here, had requested several specific jury instructions concerning specific mitigating factors. While the court indicated that it has been consistently concerned that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence, "we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." *Id*., 522 U.S. at ___, 118 S.Ct. at 761, 139 L.Ed.2d at 710. Like the instructions in *Buchanan*, the instructions here did not foreclose the jury's consideration of any mitigating evidence. "By directing the jury to base its decision on 'all the evidence,' the instruction afforded jurors an opportunity to consider mitigating evidence." *Id.*, 522 U.S. at ___, 118 S.Ct. at 762, 139 L.Ed.2d at 710. See, also, *Boyde v. California* (1990), 494 U.S. 370, 386, 110 S.Ct. 1190, 1201, 108 L.Ed.2d 316, 333 ("[T]here is not a reasonable likelihood that the jurors in petitioner's case understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by petitioner.").

E. Instructions on Mercy and Residual Doubt

**{¶ 45}** Despite appellant's claims, the trial court need not instruct on mercy. *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 417, 613 N.E.2d 212, 216. Nor need the court instruct on residual doubt. *State v. Garner* (1995), 74 Ohio St.3d 49, 56-57, 656 N.E.2d 623, 632. Furthermore, residual doubt is not relevant in a mitigation

consideration. *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus ("Residual doubt is not an acceptable mitigating factor under R.C. 2929.04[B], since it is irrelevant to the issue of whether the defendant should be sentenced to death.").

F. Definition of Reasonable Doubt for Penalty Phase

**{¶ 46}** During the penalty phase the trial court overruled the appellant's request for the following instruction: "Reasonable doubt is present when you are not firmly convinced that death is the appropriate punishment."

**{¶ 47}** The trial court instructed instead:

"Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based upon reason and common sense. Reasonable doubt is a doubt—reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral courage—on moral evidence is open to some possible doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs."

**{¶ 48}** While the foregoing is generally an acceptable definition of "reasonable doubt," in *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 96, we recognized that this definition, taken from 4 OJI 403.50 (1997) (see 4 OJI 503.016[A][3]), may not be a fully appropriate instruction during the penalty phase of a capital case. In *Taylor*, the defendant had requested the same instruction as that requested in this case. We stated that "[a]lthough appellant's proposed instruction may be preferred, the flaw, if any, is harmless." *Id*. at 29, 676 N.E.2d at 96. In so stating, we did not mean to indicate or to otherwise suggest that the instruction that had been proposed was an instruction that should have been given. In *Taylor*, we went on to explain that "[o]verall, the trial court clearly instructed the jury that, before recommending death, it must be convinced beyond a reasonable

doubt that the aggravating circumstance outweighed the mitigating factors, and that the prosecution had the burden of proof on the issue." *Id*. at 30, 676 N.E.2d at 96. Thus, as we indicated in *Taylor*, and as we once again emphasize today, an appropriate penalty-phase instruction on the issue of reasonable doubt should convey to jurors that they must be firmly convinced that the aggravating circumstance(s) outweigh the mitigating factor(s), if any. As in *Taylor*, when all the penalty-phase instructions are considered together, there is no prejudicial error. See, also, *State v. Woodard* (1993), 68 Ohio St.3d 70, 76-77, 623 N.E.2d 75, 80; *State v. Spirko* (1991), 59 Ohio St.3d 1, 17, 570 N.E.2d 229, 248.

{¶ 49} Our clarification today, which sets forth the essence of what the instructions should convey, will, hopefully, resolve any misunderstandings that may have arisen from our statement in *Taylor* concerning what is or is not preferable in terms of a reasonable doubt instruction in the penalty phase of a capital case. We suggest that it may be appropriate for the Ohio Jury Instructions Committee of the Ohio Judicial Conference to consider drafting an instruction specifically for the penalty phase regarding reasonable doubt.

### G. Parole Instruction

{¶ 50} Appellant filed a motion requesting a jury instruction on how the parole system works, such as the circumstances under which appellant would be released on parole. The trial court denied the motion. Appellant now claims error.

{¶ 51} We have consistently held that consideration of parole and consecutive or concurrent sentences is not for the jury's consideration. See *State v. Mills* (1992), 62 Ohio St.3d 357, 374, 582 N.E.2d 972, 987; *State v. Mitts* (1998), 81 Ohio St.3d 223, 229-230, 690 N.E.2d 522, 528-529. The trial court did not abuse its discretion in declining to instruct the jury as appellant requested. Further, appellant's trial counsel made it clear in closing argument that the sentence imposed on the aggravated murder count would be in addition to the sentences he would receive on the other charges. Defense counsel also emphasized in voir dire and in

closing argument that even if a life sentence was imposed, there was no guarantee that parole would be granted.

**{¶ 52}** In sum, none of appellant's assertions rises to the level of prejudicial error; therefore, his first proposition of law is overruled.

II

Trial Court Opinion

**{¶ 53}** Appellant argues in his second proposition of law that the trial court committed error in its sentencing opinion by refusing to give mitigating weight to the fact that he suffered from alcohol and drug abuse. The trial court stated in relevant part:

"The Defendant has argued that he suffered from alcohol and/or drug impairment at the time of the offense.

"Although there was evidence that the Defendant had used crack cocaine earlier in the day, there was no evidence that at the time of the offense he had used alcohol or was under the influence of either alcohol or crack cocaine at the time of this offense. Furthermore, the use of alcohol or drugs is not an excuse for committing a crime.

"The Court assigns no weight to this as a mitigating factor."

**{¶ 54}** Appellant argues that the evidence of his alcohol and drug abuse was not offered as an excuse for the crime; instead, it was presented to show that his cocaine habit controlled his life and the decisions he made. Appellant argues that therefore, the trial court should not have refused to consider it as a mitigating factor. The court of appeals found that "while the trial court's statement that 'the use of alcohol or drug[s] is not an excuse for committing a crime' is arguably inartful * * *, it does not, contrary to appellant's assertion, require the drug or alcohol use to rise to the level of a defense before it can be considered as a mitigating factor." The court of appeals determined that the trial court did consider appellant's alcohol and drug abuse as a mitigating factor, "but chose to assign absolutely no weight to it."

{¶ 55} We generally agree with this conclusion reached by the court of appeals. The trial court's statement that it "assigns no weight to this as a mitigating factor" indicates clearly that the trial court did not "refuse to consider" alcohol and drug abuse as a mitigating factor. At the same time, we also agree that some of the trial court's earlier chosen language may be inartful, to the extent that the trial court's sentencing opinion may be susceptible of a reading that indicates no need to consider the factor simply because appellant was not under the influence of drugs or alcohol *at the time of the offense*. The court's statement in that regard would be an incorrect definition of mitigation, one that relates directly to culpability, as opposed to those factors that are relevant to whether the offender should be sentenced to death. See *State v. Holloway*, 38 Ohio St.3d at 242, 527 N.E.2d at 835. However, when this portion of the sentencing opinion is considered in its entirety, there is no error. Moreover, if there was error, our independent review would cure it. We overrule appellant's second proposition of law.

III

Voir Dire Questioning

{¶ 56} In his third proposition of law, appellant argues that the sentencing decision is unreliable because the trial court overemphasized the death penalty in its questioning of the jurors.

{¶ 57} During individual voir dire, the parties questioned the potential jurors extensively on the death penalty. After the juror had been passed for cause, the trial court concluded questioning by asking that juror, "If the case were proper, and the facts would warrant it, and the law would permit it, could you join in signing a verdict form which recommends to the Court the imposition of the death penalty?"

{¶ 58} Appellant concedes that under certain circumstances this question could be proper. However, since this was the last question that each juror was asked before being excused for the day, and since the jurors were not asked whether they

could join in the verdict for a life sentence, appellant asserts that it unduly emphasized death and denied him an impartial jury.

{¶ 59} Trial counsel did not object to the questioning and therefore the issue must be reviewed under the plain error standard. An alleged error "does not constitute a plain error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Appellant has not met that burden here.

{¶ 60} While the question may have been repetitive at times, the same question was asked of almost all prospective jurors, which provided consistency of questioning. Since plain error is absent here, appellant's third proposition of law is overruled.

IV

Prosecution Argument—Non-Statutory Aggravating Circumstances

{¶ 61} Appellant alleges in his fourth proposition of law that the death sentence must be reversed because of the prosecutor's penalty-phase closing argument. Appellant argues that the state failed to limit itself to argument solely on the statutory aggravating circumstances and therefore infected the jury deliberations.

{¶ 62} Appellant appears to believe that the prosecutor's argument was limited solely to the aggravating circumstances. Therefore, appellant argues, evidence that the defense presented during the penalty phase was not subject to comment by the prosecutor. This contention is simply wrong.

{¶ 63} Appellant mischaracterizes the prosecutor's arguments. All of the prosecutor's arguments cited by appellant were proper, and were based on testimony and evidence presented by the defense. See *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542.

**{¶ 64}** The prosecutor, however, did overstep the bounds of proper argument on one occasion, arguing that the jury must set the standards of behavior acceptable to society, and appealing to public sentiment. However, defense counsel immediately objected, and the jury was instructed to disregard the prosecutor's inappropriate comments. The jury is presumed to follow the court's instruction. *State v. DePew*, 38 Ohio St.3d at 284, 528 N.E.2d at 553. Appellant's fourth proposition of law is overruled.

V

Jury Deliberation on Two Counts for One Victim

**{¶ 65}** Appellant was indicted on two counts of aggravated murder for the death of one victim. Both counts alleged aggravated felony murder under R.C. 2903.01(B); however, count one included aggravated burglary as the felony and count two relied on aggravated robbery. Appellant was convicted on both counts.

**{¶ 66}** Appellant filed a motion prior to trial requesting that the state elect which count it would go forward on. The court overruled the motion. After conviction, but prior to the start of the penalty phase, appellant renewed the motion. The state again objected, arguing that it was not required to elect until "sentencing."

**{¶ 67}** At the close of the evidence in the penalty phase, the defense again renewed all its motions, which the court overruled. At the sentencing hearing, the state elected to proceed on the first count for sentencing purposes. The trial court sentenced appellant to death on count one. Appellant now argues in his fifth proposition of law that it was error to allow the jury to consider both counts.

**{¶ 68}** In *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523, 538, this court stated, "Case precedent establishes that the state may submit to the jury two crimes that are allied offenses of similar import. However, the law prohibits a conviction of both crimes. *State v. Osborne* (1976), 49 Ohio St.2d 135, 3 O.O.3d 79, 359 N.E.2d 78." A "conviction" includes both the guilt determination and the penalty imposition. Only one penalty of death was given to appellant.

17

Thus, only one conviction actually occurred. See *State v. Henderson* (1979), 58 Ohio St.2d 171, 12 O.O.3d 177, 389 N.E.2d 494; R.C. 2941.25(A).

{¶ 69} In *State v. Waddy* (1992), 63 Ohio St.3d 424, 447, 588 N.E.2d 819, 836, we rejected the proposition that the prosecution must elect, before the penalty phase, which count shall be submitted to the jury for sentencing. See, also, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 5-6, 520 N.E.2d 568, 572. Appellant's fifth proposition of law is overruled.

VI

Application of Evidence Rule 612

{¶ 70} Manuel Jackson was a key witness for the state. On cross-examination of Jackson, appellant used two separate documents in an attempt to impeach his testimony. Appellant now argues in his sixth proposition of law that the state was erroneously allowed to elicit "extraneous matters" from these documents in violation of Evid.R. 612. There is no merit to appellant's argument regarding either document.

{¶ 71} The first document was a statement that Jackson gave to the Clinton County Sheriff's Department. Defense counsel used the statement during cross-examination to impeach Jackson concerning the time that he and appellant delivered the furniture to Rutledge. The prosecutor sought to have Jackson read the entire statement to the jury. Defense counsel objected and the court sustained the objection. The prosecutor then requested Jackson to read the statement silently to himself and inquired whether there was anything else in the statement that conflicted with his testimony. After reviewing the statement, Jackson indicated that there was not.

{¶ 72} Defense counsel also questioned Jackson concerning whether he had been working with the police to obtain a confession from appellant. When Jackson said that he did not recall doing that, defense counsel asked Jackson about a letter Jackson had written Judge McBride of the municipal court. Jackson remembered

writing the letter, but not saying the things that defense counsel was questioning him about. Defense counsel then showed Jackson the letter. After reading it, Jackson admitted that the letter indicated that he had told Judge McBride that the police wanted to put him in with appellant to get a confession, but that Jackson did not remember saying that in the letter.

{¶ 73} During redirect, the prosecutor sought to elicit from Jackson why he wrote the letter to Judge McBride. Defense counsel objected, and the trial court overruled it. Jackson, after reading the letter again, testified that he told the judge that he had felt his family would be in danger if he testified against appellant.

{¶ 74} Contrary to appellant's assertions, at no time were the "entire documents" either read to, or given to, the jury, nor were they admitted into evidence.

{¶ 75} Evid.R. 612 provides:

"Except as otherwise provided in criminal proceedings by Rule 16(B)(1)(g) and 16(C)(1)(d) of Ohio Rules of Criminal Procedure, if a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. * * *"

{¶ 76} Here, the requirements of Evid.R. 612 were met. Jackson used the documents to refresh his recollection and then answered the defense questions based upon the refreshed recollection. The documents themselves were given to the witness and the prosecutor had an opportunity to examine them. The trial court was correct in prohibiting the prosecutor from asking the witness to read the statement aloud, but properly overruled the defense objections concerning the remaining questioning on redirect. The defense counsel opened the door to the

questions regarding the documents during cross-examination. The state properly probed the areas of cross-examination and was limited by the trial court from going beyond the scope of cross-examination. Defense counsel was also given an opportunity to recross the witness. The trial court committed no error. We overrule appellant's sixth proposition of law.

## VII

### Failure to Excuse Juror for Cause

{¶ 77} Appellant argues in his seventh proposition of law that the trial court erred by failing to excuse prospective juror Murphy for cause. This prospective juror indicated his belief that psychological testimony is used too often in trials. He added, however, that he was willing to listen to the testimony. After Murphy was questioned extensively by both parties and the trial court, the court overruled the defense challenge for cause. Appellant later used a peremptory challenge to excuse the juror.

{¶ 78} The determination of issues raised in voir dire is within the trial judge's discretion. *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274, 285. "A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576, 587.

{¶ 79} The trial court did not abuse its discretion in failing to excuse Murphy for cause. Appellant's seventh proposition of law is overruled.

## VIII

### Sufficiency of Conviction on Grand Theft

{¶ 80} Appellant was charged with two counts of grand theft for the taking of Myrtle Rutledge's automobile. One count relied on R.C. 2913.02(A)(1) and the other on R.C. 2913.02(A)(4). A specification attached to each count alleged that appellant caused physical harm to Rutledge during the commission of the offense.

The jury found appellant guilty of one of the counts, R.C. 2913.02(A)(1), but acquitted him of the other. He was also found not guilty of the specification. Appellant now, in his eighth proposition of law, challenges the sufficiency of the evidence relating to this charge.

{¶ 81} When a defendant challenges the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. See *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573.

{¶ 82} Pursuant to R.C. 2913.02, the state was required to prove:

"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

"(1) Without the consent of the owner or person authorized to give consent."

{¶ 83} Mrs. Rutledge owned a 1980 Toyota. When her son left her house on September 15, 1994, the car was parked at her house. On September 16, 1994, persons traveling by the Rutledge house did not see the car. Linda Barkey testified that in the early morning hours of September 16, 1994, the Toyota was parked outside her house on North High Street, where it remained until she notified the police on September 17. When the car was examined by trace evidence experts, the car keys were on the floor of the driver's side and, in the expert's opinion, the car had been "wiped down," *i.e.*, wiped clean of fingerprints.

{¶ 84} Jackson testified that he and Bart met appellant between approximately 1:00 a.m. and 1:30 a.m. on September 16, 1994. Appellant had about $80 worth of crack on him, and they all went to appellant's home to smoke it. Later, they decided to steal some meat at a local grocery store. Jackson testified

that appellant stated that he knew where there was a car they could use to get to the grocery, but it was stolen. Jackson and Bart decided against using the stolen car.

**{¶ 85}** Appellant does not challenge the sufficiency of the evidence on any of the remaining charges. All the evidence, when reviewed in a light most favorable to the state, provides sufficient evidence of a grand theft of an automobile.

**{¶ 86}** Appellant focuses on two points. First, he argues that Jackson's testimony concerning his statement that appellant knew where they could get a stolen car to use in the robbery, should not be believed because Jackson was a crack user who had been convicted of drug crimes. Appellant fails to recognize that in a review of the sufficiency of the evidence, the court does not engage in a determination of the witnesses' credibility. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

**{¶ 87}** Second, appellant emphasizes that there was insufficient evidence to prove that appellant intended to *permanently withhold* the vehicle from its owner. However, that is just one alternative of the definition of deprive. To "deprive" also includes "dispos[ing] of property so as to make it unlikely that the owner will recover it" or "[a]ccept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration." R.C. 2913.01(C)(1) and (3).

**{¶ 88}** The state presented sufficient evidence that a reasonable jury could find that appellant committed the crime of grand theft when he took the victim's vehicle. Appellant's eighth proposition of law is overruled.

IX

Ineffective Assistance of Counsel

**{¶ 89}** In his ninth proposition of law, appellant cites four reasons why his counsel's representation was ineffective. None of these reasons, however, constitutes the ineffective assistance of counsel.

**{¶ 90}** In order to prevail on a claim of ineffective assistance of counsel, appellant must show that counsel's performance fell below an objective standard of reasonableness and, in addition, that prejudice arose from counsel's deficient performance. See *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.Ed.2d 373, paragraphs two and three of the syllabus. Appellant has failed to meet either prong on any of his four allegations.

**{¶ 91}** Appellant first argues that trial counsel should have objected to the trial court's voir dire questions concerning the imposition of the death penalty. However, we have upheld similar questioning in previous cases. See *State v. Evans* (1992), 63 Ohio St.3d 231, 249-250, 586 N.E.2d 1042, 1057-1058; *State v. Rogers* (1985), 17 Ohio St.3d 174, 177-178, 17 OBR 414, 417-418, 478 N.E.2d 984, 989-990. Therefore, the failure to object to this questioning was not ineffective.

**{¶ 92}** Appellant also asserts that his attorneys were ineffective for failing to inquire about various mitigating factors during voir dire. However, this was not error. We held in *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292, 301, that the trial court did not err by failing to allow defense counsel to voir dire on individual mitigating factors. See, also, *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304, 314-315. Since no requirement exists for such questioning, defense counsel did not err in failing, for whatever reason, to attempt to question the jurors on specific factors. Further, defense counsel did question the jurors concerning the probable testimony of a psychologist in the penalty phase and obtained their views on this kind of testimony. In the course of this questioning, counsel indicated that there would be a great deal of information on appellant's family background.

**{¶ 93}** Third, appellant argues that defense counsel failed to object to the court's instructing the jurors on two counts of aggravated murder. Appellant misrepresents the record in this regard. Counsel filed a motion concerning the

election of counts prior to the start of the penalty phase. Trial counsel properly preserved this issue.

{¶ 94} Finally, appellant argues that trial counsel failed to object to improper prosecutorial argument. Again, appellant is incorrect. On the one occasion that the state did make an improper argument, trial counsel objected, and the jury was then instructed to disregard the state's argument.

{¶ 95} Appellant has failed to meet his burden of showing that his trial attorneys were ineffective in their representation, and therefore, his ninth proposition of law is overruled.

X

Cumulative Error

{¶ 96} Appellant argues in his tenth proposition of law that the cumulative effect of all the errors he has presented violated his right to a fair trial. This court has found in the past that multiple errors that are separately harmless may, when considered together, violate a person's right to a fair trial in the appropriate situation. See *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus. However, in order even to consider whether "cumulative" error is present, we would first have to find that multiple errors were committed in this case. Appellant received a fair trial, and any errors were harmless or non-prejudicial, cumulatively as well as individually. Appellant's tenth proposition of law is overruled.

XI

Constitutional Challenge

{¶ 97} Appellant argues in his eleventh proposition of law that Ohio's capital sentencing scheme results in cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. He alleges that the statute is unconstitutional for twelve reasons. The court has previously examined these issues and determined that Ohio's statute is constitutional. See *State v. Jenkins*

(1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125-126, 31 OBR 273, 285-286, 509 N.E.2d 383, 396; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph six of the syllabus; *State v. Lewis* (1993), 67 Ohio St.3d 200, 206, 616 N.E.2d 921, 926; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795. Therefore, these claims are summarily rejected. *State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568, at the syllabus. Appellant's eleventh proposition of law is overruled.

XII

Independent Sentence Review and Proportionality Analysis

{¶ 98} Having rejected all of appellant's propositions of law, we must independently weigh the aggravating circumstance against the factors presented in mitigation, as required by R.C. 2929.05(A).

{¶ 99} The evidence in the record supports finding that appellant committed the aggravated murder of Myrtle Rutledge while he was committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated burglary. Moreover, the evidence establishes that appellant was the principal offender in the commission of the aggravated murder.

{¶ 100} The nature and circumstances of the crime offer nothing in mitigation for appellant. However, his history, character, and background suggest some mitigating factors.

{¶ 101} Appellant's father died of a heart attack when appellant was four years old. At the time appellant, his two sisters, and his parents were living in a trailer in Somerset, Kentucky. After appellant's father's death, Kentucky social services became involved with the family. As a result, appellant's sister Melissa went to live with their grandmother in Florida, and appellant, his sister Janice, and

his mother moved to Ohio. Much of appellant's childhood was spent living in housing that was condemned, many times without even toilet facilities in the house.

{¶ 102} Appellant's mother was not employed and subsisted on welfare. She was a failure at motherhood, providing very little supervision. The children skipped school most of the time.

{¶ 103} In 1988, Clinton County Children Services got involved and gave appellant's mother two weeks to move out of the house. When appellant was thirteen, his mother moved them to the home of a man she had met that same day at a supermarket. By this time, appellant's older sister had already become pregnant, then married and moved out of the house.

{¶ 104} Children Services eventually removed Melissa and appellant from the custody of their mother, and eventually placed them into Mid-Western Children's Home ("Midwest"). Appellant never had the structured environment and parental guidance as a base and rebelled when he was placed in Midwest (and later numerous foster homes) and rules were imposed upon him. Even though his mother visited him only rarely, he strove to get back to live with her so he could do as he pleased.

{¶ 105} Sharon Cole, one of appellant's teachers, testified that she would pick him up from Midwest on Saturdays to spend time with her family. She indicated that she wished she could have helped appellant because when he was with her and her family he seemed fun-loving, giving, and affectionate.

{¶ 106} When appellant became eighteen, he was no longer under the authority of Children Services and moved back with his mother. Later, he and Tim Shaffer moved in together. Charlotte Fisher, his landlady, testified that she rented an apartment in her house to appellant and Shaffer from October 1993 until January 1994. Appellant always paid his rent on time and was a good tenant. They were asked to move out because of problems with Shaffer.

{¶ 107} Dr. Jeffrey Smalldon examined and tested appellant and determined him to have an overall IQ of 86. During the testing, Dr. Smalldon found that appellant did better on perceptual motor skills and nonverbal tasks. Appellant had difficulty with abstract reasoning and analytical problem solving. He had repeated kindergarten twice and failed the third grade. He never graduated from high school.

{¶ 108} Dr. Smalldon's investigation into appellant's life revealed that appellant was an unwanted child from the moment of conception. His mother had undergone a tubal ligation, but appellant was conceived after that procedure. While the doctors recommended abortion, his mother chose to give birth. His father died when appellant was very young, and it affected him so traumatically that he tried to crawl into the casket with his father at the funeral home. Dr. Smalldon testified that it is not possible to overemphasize the effect the loss of the same sex parent has on a child.

{¶ 109} Dr. Smalldon described appellant's childhood as chaotic. Appellant started shoplifting when he was six years old. His mother was "profoundly neglectful," failing to provide even the basic needs of food, clothes and school. Because of his experience with his mother, appellant never learned the connection between hard work and getting what he wanted. Appellant would shoplift clothes and food. He first appeared in juvenile court when he was eleven or twelve.

{¶ 110} The Minnesota Multiphasic Personality Inventory (MMPI) showed appellant to be a person with significant problems with trust and a suspicious attitude towards others. He had a tendency to engage in anti-social behavior and could be described as self-absorbed and grandiose.

{¶ 111} Appellant's history, character, and background are entitled to some mitigating weight.

{¶ 112} The factors set forth in R.C. 2929.04(B)(1), (2), (3), (5), and (6) are inapplicable. Appellant was nineteen years of age at the time of the crime, and that factor is entitled to consideration under R.C. 2929.04(B)(4). However, under the circumstances of this case, we afford it little weight. See *State v. Beuke*, 38 Ohio St.3d at 44-45, 526 N.E.2d at 290.

{¶ 113} Under R.C. 2929.04(B)(7) (the catchall provision), we consider appellant's history of substance abuse, including alcohol, which he began in earnest when he was eleven. He also used marijuana, "speed," and inhalants. His crack cocaine dependency occurred during a period of several months in 1994, leading to this crime. However, we give little weight to appellant's voluntary substance abuse. See *State v. Benge* (1996), 75 Ohio St.3d 136, 147, 661 N.E.2d 1019, 1029; *State v. Slagle* (1992), 65 Ohio St.3d 597, 614, 605 N.E.2d 916, 931; *State v. Clark* (1988), 38 Ohio St.3d 252, 264, 527 N.E.2d 844, 856.

{¶ 114} It was Dr. Smalldon's opinion that appellant would do well in a structured environment. While appellant's ability to adjust to prison life can be considered under R.C. 2929.04(B)(7), we accord little weight to this point. Finally, "residual doubt" is not a factor for our consideration, since it is not relevant to whether appellant should be sentenced to death. See *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, at the syllabus.

{¶ 115} When the aggravating circumstance is weighed against the mitigating factors taken together, it outweighs the factors in mitigation beyond a reasonable doubt.

{¶ 116} This court has reviewed at least three other cases with the sole aggravating circumstance of aggravated burglary: *State v. Bonnell* (1991), 61 Ohio St.3d 179, 573 N.E.2d 1082; *State v. Franklin* (1991), 62 Ohio St.3d 118, 580 N.E.2d 1; and *State v. Campbell* (1994), 69 Ohio St.3d 38, 630 N.E.2d 339. In *Bonnell*, the defendant entered a home through deceit and shot the victim two times. The only factor presented in mitigation was residual doubt. In *Franklin*, the

defendant broke into the victim's apartment, beat the victim to death with a claw hammer, and then robbed the victim. Franklin presented evidence in mitigation that included his age (twenty-one), residual doubt, lack of a serious prior criminal record, his childhood illnesses that resulted in a poor school performance, and a loving, nurturing family. In *Campbell*, the defendant entered the victim's home to rob him; the victim was found murdered with a knife through his wrist. Campbell presented some compelling mitigating evidence in that he was disfigured as a child in a fire and spent a year in the hospital. This event affected Campbell's life, causing him to turn to drugs and alcohol and to develop mental and emotional problems.

{¶ 117} In each of the three cases, we affirmed the death sentence. While appellant's mitigating evidence may seem somewhat more compelling than that in either Bonnell's or Franklin's case, appellant's case is comparable to Campbell's. Appellant's childhood was also difficult and resulted in a significant drug and alcohol problem. Appellant was only nineteen when the crime was committed, compared to Campbell's age of twenty-seven; however, that distinction alone does not make appellant's death sentence disproportionate.

{¶ 118} For all of the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

―――――――――――