[Cite as *State v. Stavole*, 2012-Ohio-4719.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 97791

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ADRIANO STAVOLE

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-544478

**BEFORE:** Boyle, P.J., Blackmon, A.J., and Keough, J.

**RELEASED AND JOURNALIZED:** October 11, 2012

**ATTORNEY FOR APPELLANT**

Robert A. Gaffney
75 Public Square
Suite 714
Cleveland, Ohio   44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Steven E. Gall
        John P. Colan
Assistant County Prosecutors
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1} Defendant-appellant, Adriano Stavole, appeals his conviction for kidnapping, with a sexual motivation specification, as being against the manifest weight of the evidence and not supported by sufficient evidence. Finding no merit to the appeal, we affirm.

### Procedural History and Facts

{¶2} Stavole was indicted on two counts: (1) rape, in violation of R.C. 2907.02(A)(2), and (2) kidnapping, in violation of R.C. 2905.01(A)(4), with a sexual motivation specification under R.C. 2941.147(A). Stavole pleaded not guilty to the charges, and the matter proceeded to a jury trial.

{¶3} The state's case primarily relied on the victim, L.C., who testified to the following.

{¶4} On November 18, 2010, around 9:30 p.m., L.C. picked up her friend, Clarissa Moysaenko, to go out for the evening. L.C. testified that Clarissa had recently broke off an engagement so L.C. wanted to lift her spirits and have a fun night out. The two headed to Around the Corner, a bar in Lakewood, and then a couple more bars-restaurants before ultimately ending their evening at the Harry Buffalo in Lakewood, where they joined L.C.'s longtime friend, Bryan Corrigan.

{¶5} At the Harry Buffalo, Clarissa was hanging out with a group of guys that included Stavole. L.C. did speak briefly with Stavole, meeting him for the first time.

At closing time, L.C., accompanied by Clarissa, agreed to give Stavole, who lived in Lakewood, a ride home.

{¶6} When they reached Stavole's house, L.C. and Clarissa accepted Stavole's invitation to go inside and have a glass of wine. L.C. explained that although she was tired, she agreed to go inside because she thought Clarissa was interested in Stavole. She further acknowledged that Clarissa had quite a bit to drink that evening. Once inside, they all hung out together for approximately 45 minutes before Stavole and Clarissa went upstairs; L.C. stayed downstairs on the living room couch. According to L.C., "they were [all] having fun" up to this point.

{¶7} Shortly thereafter, Stavole came downstairs in his boxers and T-shirt, stating, "she's passed out, it's either you or her." At this point, L.C. texted her friend Bryan, asking for help. Stavole then grabbed L.C.'s right wrist, resulting in them "fighting and kicking" and L.C. grabbing and twisting Stavole's "genital area" with her left hand. But then Stavole "fell forward and grabbed [L.C.'s] other wrist," ultimately straddling L.C. on the couch. According to L.C., Stavole then pulled her jeans down with one hand while restraining her with the other hand. L.C. then "felt a pain" inside her vagina consistent with sexual intercourse, which lasted for approximately one minute. She further testified that Stavole was "gyrating" on top of her at this time. She pleaded for him to stop, and Stavole responded by saying, "I'm so sorry. I don't mean to hurt you."

**{¶8}** L.C. further testified that Stavole eventually just let her get up and leave after having struggled with her for about 15 minutes and penetrating her for about one minute. Once freed, L.C. immediately ran upstairs, screamed at Clarissa to get up and then ran into the bathroom to text Bryan.

**{¶9}** L.C. and Clarissa went straight to Lakewood Hospital, but they were directed to go to Fairview Hospital, where there was a sexual assault nurse examiner ("S.A.N.E.") on call. While at Fairview Hospital, L.C. provided a statement to the police, detailing the events of the early morning. L.C. further testified that the red marks, bruises, and scratches (as depicted in the photographs taken by the S.A.N.E. nurse) were not there prior to the evening.

**{¶10}** L.C. testified that the only prescription drugs that she was taking at the time of the incident, i.e., Lexapro (for anxiety), a prescription for migraines, and birth control, do not affect her memory. She further admitted that she had consumed approximately four glasses of wine over the course of the evening, while her friend Clarissa "was drinking a lot more."

**{¶11}** On direct-examination, the state offered some of the texts exchanged between L.C. and Bryan during the early hours of November 19 that allegedly immediately preceded and followed the attack. The texts were presented in an enlarged paper print-out from a photograph of L.C.'s screen of her phone. According to L.C., she sent three separate text messages of the word "please" immediately before 3:15 a.m. She sent those messages right when Stavole came downstairs, announcing that "she's passed out."

Then at 3:15 a.m., Bryan responded with "Where are you?" appearing in two text messages. Four texts from L.C. followed, stating twice "I don't know"; and then the following two: "They r in front of doorway"; and "Coming for doorway." L.C. testified that the word "they" referred to Stavole and that she doesn't know why she put "they." Bryan then responded with "Please what?"; "I'm at home   * * * Not sure where ur [sic] at," to which the next text from L.C. states, "I need help."

{¶12} Following these exchanges of texts, the next time stamp that appears on the screen is "Nov 19, 2010 3:32 AM," with the following text below it from Bryan: "U o.k?" L.C. responded, "Door," to which Bryan responded "?" Then the following four separate texts from L.C. were sent: "Fuc"; "Help mep"; "Me"; and "Pleases." According to L.C., she sent the texts that appear under the "3:32 AM" time stamp when she was in the bathroom after Stavole allegedly attacked her.

{¶13} On cross-examination, L.C. acknowledged that she never told the police about the texts at the time of her statement. She explained that she presented the texts to the police about two weeks later. She further admitted that in her written statement to the police, she stated that "I was asleep. The next thing I knew, he was on top of me." Thus, in her written statement, she never mentioned the texts or that she texted Bryan upon seeing Stavole in his underwear at the bottom of the stairs.

{¶14} The state also offered the testimony of Clarissa and Bryan to corroborate aspects of L.C.'s testimony. Clarissa did not remember many details of the evening but clearly recalled L.C. waking her up, screaming that it was time to go. Clarissa was

alarmed because L.C. was upset. Clarissa further corroborated that L.C. had red marks on her arm that Clarissa had not noticed earlier in the evening. Bryan testified to receiving the texts from L.C. and responding to them.

{¶15} Lakewood police officer Neil Thibodeaux testified that he responded to the sexual assault complaint, took L.C.'s statement at the hospital, and collected the evidence from the rape kit and the victim's clothing. He testified that L.C. was extremely emotional and that he observed bruising on her right wrist.

{¶16} The S.A.N.E. nurse who treated L.C. also testified that L.C. was extremely emotional during her examination. The nurse further testified to the examination that she took, including collecting vaginal and anal swabs, and photographing red marks, bruising, and a scratch.

{¶17} The DNA testing conducted in this case, which included the use of the rape kit and known samples from L.C., Stavole, and L.C.'s boyfriend revealed that the semen identified in the anal sample of the rape kit was consistent with L.C.'s and her boyfriend's DNA (Stavole was excluded from the anal sample). Although semen was identified in the vaginal sample, the results were inconclusive.

{¶18} Lakewood detective Larry Kirkwood testified that he investigated and followed up on the report of sexual assault received by Officer Thibodeaux. After learning of Stavole's identity, Det. Kirkwood called L.C. and Clarissa to the station where they positively identified Stavole in a photo array. Stavole was later arrested on the charges.

**{¶19}** The defense called one witness, Michael Potraffke, manager at Harry Buffalo. Potraffke testified that he knows L.C., Bryan, and Stavole and that he saw all three of them on November 19, 2010. Specifically, he recalled seeing L.C. and Stavole in a group with two other people — the four of them stayed at the bar until closing. According to Potraffke, L.C. and Stavole were talking together, while Clarissa and the other guy were talking to each other. He characterized the conduct between Stavole and L.C. as "friendly." He further testified that all four of them left the bar together around 2:30 a.m. and that they were the last ones to leave the bar.

**{¶20}** The jury ultimately found Stavole not guilty on the rape charge but guilty on the kidnapping with a sexual motivation specification. The trial court sentenced Stavole to three years in prison. Stavole now appeals, raising the following two assignments of error:

> I. The state did not present sufficient evidence to show that appellant committed the offense of kidnapping, with a sexual motivation. Accordingly, his conviction for kidnapping in Count 2, along with the sexual motivation specification, are against the sufficiency of the evidence and should be reversed because they violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Constitution of the State of Ohio.

> II. The guilty verdict in this case was against the manifest weight and should be reversed because it violates the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Constitution of the State of Ohio.

<u>Sufficiency and Manifest Weight of the Evidence</u>

{¶21} In his first and second assignments of error, Stavole argues that the state failed to present sufficient evidence and that his conviction was against the manifest weight of the evidence.

{¶22} An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jenks* at 273.

{¶23} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, *supra*, at 390. When a defendant asserts that a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387.

**{¶24}** Stavole was convicted of kidnapping under R.C. 2905.01(A)(4), which states the following:

> No person, by force, threat, or deception * * * shall remove another person from the place where the other person is found or restrain the liberty of the other person, [in order to] engage in sexual activity * * * with the victim against the victim's will.

**{¶25}** Force is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Sexual activity is defined as "sexual conduct or sexual contact, or both." R.C. 2907.01(C). Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

**{¶26}** Under his sufficiency challenge, Stavole does not make any argument that the state failed to present evidence as to each element of the offense. Instead, his sufficiency challenge is essentially an attack on the credibility of the victim — a matter not appropriate for a sufficiency challenge. Indeed, "in a review of the sufficiency of the evidence, the court does not engage in a determination of the witnesses' credibility." *State v. Goff*, 82 Ohio St.3d 123, 135, 694 N.E.2d 916 (1998). The arguments raised fall more squarely in a manifest weight of the evidence analysis, which we will discuss below. Nonetheless, in this case, based on the testimony of L.C., we find that any rational trier of fact could have found Stavole guilty beyond a reasonable doubt on the charge of

kidnapping with a sexual motivation specification. We, therefore, overrule the first assignment of error.

{¶27} We now turn to the manifest weight of the evidence challenge, examining the arguments that Stavole raised in his sufficiency challenge.

{¶28} Stavole contends that the state's entire case hinged on L.C., who was simply not credible. In support of his claim, Stavole argues that (1) L.C.'s stated time line of the events conflict with the time stamps reflected on the text messages; (2) L.C. never mentioned the texts to the police in her written statement immediately following the incident; (3) L.C.'s version of the events that evening understated her interaction with Stavole in contrast to Potraffke's testimony; and (4) the texts do not make sense and L.C. could not adequately explain them at trial.

{¶29} We acknowledge that this is a very difficult case and one that came down to whether the jury believed the victim. Despite defense counsel's best effort to paint a picture of L.C. making poor decisions, regretting those decisions, and then fearing her boyfriend may discover her indiscretion, the jury simply did not find that to be the case.

{¶30} And while we agree that inconsistencies appear in L.C.'s testimony, we do not find that these inconsistencies render her entire testimony unreliable or unbelievable. Notably, these inconsistencies were explored at trial and presented to the jury to consider. We agree that the text messages seem bizarre and that L.C.'s explanation for failing to mention them was questionable. But the jury may have chosen to disregard the text messages altogether based on the fact that L.C. failed to mention them to the police

initially. The text messages, however, did not prove the elements of the case. The state arguably offered them to bolster L.C.'s testimony. But even if the jury disregarded the text messages, they could still have found L.C. to be telling the truth regarding Stavole holding her wrists down, pulling her pants down, gyrating on top of her, all while trying to insert his penis. Notably, L.C. consistently reported to the police and the S.A.N.E. nurse that Stavole held her down, after announcing, "She's passed out, it's either you or her."

{¶31} As for Stavole's claim that L.C. downplayed her interactions with Stavole before the alleged incident, thereby rendering her testimony not credible, we disagree. There was no dispute that all the parties involved, including L.C., were having a good time together, even up until the time that Clarissa and Stavole went upstairs. Even L.C. testified that she was "in a good mood" while driving Stavole home and that once inside his house, "they were talking and having a good time." According to L.C., however, her mood and demeanor drastically changed after Stavole left Clarissa upstairs and confronted her.

{¶32} Based on all the evidence presented, the jury could have found that L.C. was traumatized as to what happened between her and Stavole, and therefore may not have accurately recalled all the details of the evening. Notably, although she may have believed that Stavole inserted his penis inside her vagina, the jury obviously did not accept this testimony. However, the jury found other aspects of her testimony credible. And based on the additional evidence that corroborated some of L.C.'s testimony, such as the

bruising on her wrist and hand, her abrupt exit from Stavole's house, and her extreme emotional state observed by several witnesses, we cannot say that the jury "lost its way."

{¶33} Under well-settled precedent, we are constrained to adhere to the principle that the credibility of witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *See State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). And as this court has previously recognized, a defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial. *State v. Gaughan*, 8th Dist. No. 90523, 2009-Ohio-955, ¶ 32, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, at ¶ 21. Here, the jury heard all of the testimony, and L.C.'s inconsistent statements, and still chose to believe her, at least as to the kidnapping charge. Based on the record before us, we cannot say that the trier of fact clearly lost its way. Accordingly, we find that the conviction is not against the manifest weight of the evidence and therefore overrule the second assignment of error.

{¶34} Judgment affirmed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, JUDGE

PATRICIA ANN BLACKMON, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR