DECISION AND JUDGMENT ENTRY
This is an appeal from a Hocking County Common Pleas Court, Juvenile Division, judgment that granted Hocking County Children Services (HCCS) permanent custody of Ronald Lawrence Azbell (D.O.B. 8-23-95), Donald Lee Azbell (D.O.B. 8-2-96), Harley Davidson Azbell (D.O.B. 7-31-98) and Embery Leann Walker (D.O.B. 10-31-99).[2] Lawrence Azbell, their natural father and appellant herein, does not assign any errors per se but does posit the following "issue" for review which we will treat as an assignment of error:[3]
 "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL."
A brief summary of the facts pertinent to this appeal is as follows. On July 20, 2001, appellant, Rebecca Moore and their four children visited a bank in Lee County, Illinois, where Moore attempted to cash a forged check.[4] Federal marshals were on hand and arrested Moore. Appellant took their four children and fled the area.
Appellant surfaced seven days later in South Bloomingville, Ohio, and left the children with his mother, Hazel Azbell. Appellant gave his mother their birth certificates and social security cards and told her that if he did not return, she could "keep" them. Appellant left almost immediately without telling his mother where he was going or when he would return. Mrs. Azbell was ill prepared to keep the children and thus called HCCS for help.
Several caseworkers responded to Azbell's call and brought food and diapers to help get the family through the weekend. The following Monday, however, Mrs. Azbell again phoned HCCS to tell them that she was simply unable to care for the children. HCCS obtained emergency protective orders and took temporary custody of the children.
The action below was commenced on July 31, 2001 when HCCS filed a complaint and alleged that the children were dependent, as defined in R.C. 2151.04(C), and asked for permanent custody. Along with its complaint, HCCS also submitted a detailed factual memorandum outlining an extensive investigation into the Azbell family background. That investigation revealed evidence of a transient, criminal, lifestyle in several states, as well as protective services cases opened for the children in New York and Missouri. HCCS also alleged that Moore was in jail facing multiple charges in Illinois, not to mention federal charges elsewhere, and that appellant was incarcerated in Missouri for rape.
The court appointed guardian ad litem ("GAL") filed a detailed report and opined that the children were dependent and neglected and that permanent custody would be in their best interests. In support of that recommendation, the GAL described the chaotic lives the family led over the years, the open case files by family services agencies in two separate Missouri counties, how both appellant and Moore had lost custody of other children in the past, how neither of them gave these children proper care and parenting or were able to stop their "criminal behavior" and protect them. On this latter point, the GAL described the effect of the family's lifestyle on the children as follows:
"The four children involved in the pending matter have been on the run with their parents and have been subjected to their parent's unstable lifestyle. They have been known to live in a car at times. The children have been present when the parents stole mail from mailboxes and have also been present when their parents have been arrested. It was reported that the children were not allowed to have any social contact with anyone outside their immediate family and the foster parents have stated that the children are afraid to sleep alone and that the boys talk frequently about policemen and guns and they have said that you have to be quiet when anyone comes to the door. It was also reported that [appellant] kept a loaded shotgun under the car seat when they were `on the run' and the U.S. Marshalls considered them to be armed and dangerous. The children have been in and out of foster care for the last two years. None of the children have had their immunizations kept up to date. Their health has been neglected. The children's parents have repeatedly shown that they have failed to provide for the children's basic needs."
The matter came on for an adjudicatory hearing in December, 2001. Appellant and Moore apparently admitted to the allegations contained in the complaint.[5] The trial court found the children to be dependent and scheduled a disposition hearing. In the meantime, appellant filed a motion asking that his cousin, Daniel Azbell, and his cousin's wife, Candy Azbell, be granted physical and legal custody of the four children. The trial court ordered that a home study be prepared.
A disposition hearing was held over several days in January and February of 2002. Because appellant and Moore were both incarcerated outside of Ohio, neither of them were present at this proceeding, although Moore did testify by telephone.
Mrs. Azbell testified that she rarely saw her son (appellant) because he had been in and out of prison most of his life. The witness recounted that appellant had fathered at least eleven children and that she raised and later adopted one of them (Timothy). Nevertheless, Mrs. Azbell was unable to care for these grandchildren. She noted that when her son left the children at her house, they had only a few toys and wore "scrubby clothes."[6]
Leesa George, HCCS intake supervisor, testified that the children had previously been in foster care in New York and Missouri, and that Moore had another child placed for adoption in 1990 because she was "living place to place." Sally Lanning, another HCCS supervisor, testified that when the agency first came in contact with the children they had various medical and developmental problems. Ronald and Donald both needed extensive dental work because of decayed baby teeth, and both boys experienced learning and/or speech problems in school. Donald also had trouble walking, although the precise cause of the problem was unclear. The evidence revealed that the children lived in at least five different states during their short lives (Alabama, New York, Missouri, Tennessee and Florida) which made scattered medical records almost impossible to retrieve. Further, HCCS could not collect any definitive records concerning their childhood immunizations.
Neither parent really challenged any of this evidence but, instead, focused their attention on the childrens placement with appellant's cousin, rather than permanent custody to HCCS. Although Daniel and Candy Azbell had never met these children, both testified that they wanted to have custody and even adopt them. Lanning objected, however, to placing the children with the Azbells. While there was no apparent problem with the couple's home study (Daniel had steady employment, they both ran a daycare business from their home and are seemingly competent caregivers), Lanning expressed concern about placing the children with any relative. She explained those concerns as follows:
"My concern about Dan and Candy is several things really. And I just had the one conversation that day with them — I didn't do the home study — is that with the knowledge and by me reading more into his record and in talking with the various family members, there's been no consistent contact with the family by Lawrence or Rebecca with either of their families. Rebecca has stated to me that she wants the kids back. She's also stated to me that if Lawrence is released prior to her that she believes Lawrence will go get the kids and she'll never see them again. Rebecca has also stated to me that Lawrence is violent and that her concern was that he would just take them here to her to here, you know, and move around with them.
"With that, with her statements and in reviewing his legal record, myconcern is not only the safety of the children, but really safety of therelatives. This is a pretty extensive family from what I know of and the family members I've talked to have all been very forthcoming with the fact that if Lawrence shows up at their house, that yes, he probably could get the kids away from them and concerns that they, themselves,would be put into a situation that they would be harmed or their ownfamilies would be harmed and I think that's a real scary thing.
"* * *
"And I guess that's my concern with relatives is that I do believe despite a court order giving any relative custody, that I do believe that Donald — I'm sorry, Lawrence would try to take the kids from the relatives and that these two will know where the kids are if they're with relatives. There is no doubt about that. And I believe the relatives would give in to him." (Emphasis added.)
Daniel and Candy Azbell tried to alleviate these concerns by their promise to keep the children from their father. They further related that, if appellant did indeed show up at their house, they would lock the doors and call "911." Candy Azbell, in particular, related that she was not concerned about their safety as there were several "police that live in the area."
The matter was taken under advisement and, on February 13, 2002, the juvenile court filed a detailed twelve page decision and judgment entry that granted permanent custody to HCCS. In so doing, the court found that both parents demonstrated a lack of commitment toward the children by failing to provide regular support or an adequate home. Supporting one's family through criminal means, the court aptly observed, was not "adequate." Further, appellant was incarcerated for a period of sixteen (16) months as of September 16, 2002, and Ms. Moore was incarcerated for a period of twenty-four (24) months as of that date. These factors, together with their past transient lifestyle and its detrimental effect on the childrens' health and stability, led the court to conclude that the children could not, and should not, be placed with either parent and that a grant of permanent custody to HCCS was in their best interests.
As for Daniel and Candy Azbell, the court noted that state law did not require consideration of placement with a relative unless the children were orphaned.[7] In any event, the court found that Daniel and Candy had never met the children, that there was no relationship between them and that there was too great a risk that the natural parents would try to interject themselves or otherwise interfere with the childrens' lives if they were placed with relatives. The court noted that any such interruption would be detrimental to their need for permanence and stability and would not be in their best interest. Thus, the court rejected Daniel and Candy Azbell as a potential placement. This appeal followed.
Appellant's "assignment of error" is directed at his trial counsel's decision to argue for placement of the children with Daniel and Candy Azbell. He argues on appeal that by focusing solely on that issue, and by not contesting the evidence adduced by HCCS or introducing contrary evidence, he received ineffective assistance from his trial counsel which requires a reversal of the judgment. We are not persuaded.
In the criminal context, a conviction will not be reversed on grounds of ineffective assistance of counsel unless appellant can show (1) counsel's performance was deficient, and (2) such deficient performance prejudiced the defense so as to deprive him of a fair trial. SeeStrickland v. Washington (1984), 466 U.S. 668, 687, 80 L.Ed.2d 674,104 S.Ct. 2052; also see State v. Issa, 93 Ohio St.3d 49, 67,2001-Ohio-1290, 752 N.E.2d 904; State v. Goff, 82 Ohio St.3d 123, 139,1998-Ohio-369, 694 N.E.2d 916; State v. Loza, 71 Ohio St.3d 61, 83,1994-Ohio-410, 641 N.E.2d 1082. This is a difficult standard to meet as attorneys licensed to practice in Ohio are presumed competent. See Statev. Lott (1990), 51 Ohio St.3d 160, 174, 555 N.E.2d 293; State v. Smith
(1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128; Vaughn v. Maxwell
(1965), 2 Ohio St.2d 299, 301, 209 N.E.2d 164. In reviewing ineffective assistance of counsel claims, we are admonished to be "highly deferential" to trial counsel's performance, indulge a "strong presumption" that his or her conduct falls within the wide range of reasonable professional assistance and refrain from "second-guessing" counsel's strategic decisions at trial. See State v. Carter,72 Ohio St.3d 545, 558, 1995-Ohio-104, 651 N.E.2d 965; State v. Frazier
(1991), 61 Ohio St.3d 247, 253; 574 N.E.2d 483: State v. Bradley (1989),42 Ohio St.3d 136, 142, 538 N.E.2d 373. While appellant cites no authority to that effect, we note that this same standard applies to permanent custody cases that terminate parental rights. See e.g. In reWingo (2001), 143 Ohio App.3d 652, 666, 758 N.E.2d 780; In re Helton, Hardin App. No. 6-01-07, 2002-Ohio-1765; In re Ross, Franklin App. No. 01AP-570, 2001-Ohio-4001.
We need not bother addressing whether the first prong of theStrickland test was met. Even assuming arguendo that appellant's trial counsel was deficient, and we do not mean to suggest that he was, appellant has not demonstrated any prejudice resulting therefrom.[8] The gist of appellant's argument on this point is that, "but for counsel's error in focusing on relative placement rather than the permanent custody issue, there is a reasonable probability that other evidence would havebeen introduced that would have refuted the evidence presented by Hocking County Children Services that the trial court used in its decision." (Emphasis added.) He goes on to argue that, had "appellant's counsel presented a case arguing against permanent custody, the trial court maywell have had sufficient evidence to conclude that the appellant was in fact a committed father, and therefore the outcome of the proceedings would have been different." (Emphasis added.)
In our view appellant's argument consists of pure speculation. Appellant cites us to no evidence that would have militated against terminating his parental rights. He does not even suggest that there was any. Instead, his argument is solely that evidence beneficial to his position may have been produced and that such evidence might possibly have changed the outcome of the case. This is insufficient to demonstrate ineffective assistance of counsel. Courts will not imply the requisite showing of prejudice under Strickland, but require that it be affirmatively shown. See State v. Kuntz (Feb. 26, 1992), Ross App. No. 1691; State v. Adams (Apr. 6, 1991), Washington App. No. 90CA5. Appellant has not demonstrated that any favorable evidence exists that trial counsel could have produced to countermand the overwhelming evidence presented during the trial court proceeding. Thus, appellant cannot demonstrate any prejudice in this case.
Appellant also relies on the fact that, as of September 16, 2002, he had only sixteen months left to serve in prison and that this was less than the eighteen months specified in R.C. 2151.414 (E)(12) as a factor to consider by the trial court in determining whether the children could be placed in his custody. We note that appellant's incarceration was just one of several reasons why the trial court found that the children could not, and should not, be placed in his custody. His transient and criminal lifestyle, his inability to provide a secure and stable home and his failure to demonstrate even the most rudimentary of parenting skills in the past fully support the trial court's conclusion. Even if appellant is released from prison in just a few months, we find no evidence to indicate that he could be an appropriate custodian for these children.
For these reasons, his assignment of error is not well taken and is overruled. The judgment of the trial court is hereby affirmed.
JUDGMENT AFFIRMED.
Kline, J. Evans, J.: Concur in Judgment Opinion.
[2] Embery's last name is different from her brothers' because her parents were both using aliases at the time of her birth.
[3] "Assignments of error" are a required part of an appellate brief. See App.R. 16(A)(3)(7). Indeed, the merits of a case can only be decided on the basis of those assignments of error. See App.R. 12(A)(1)(b). Furthermore, appellant's brief contains no "statement of facts" as required by App.R. 16(A)(6).
[4] Moore is the natural mother of the four children at issue. It is unclear from the record, however, whether she and appellant were married.
[5] We have no transcript of that proceeding and, thus, take this information from the court's subsequent judgment entry.
[6] When HCCS employees first came in contact with the children, Donald and Harley were wearing clothes that were too big for them, "all three boys had mens size underwear on" and Embery had "a little dress outfit on and it was too small for her."
[7] See R.C. 2151.414(B)(1).
[8] Both prongs of the Strickland test need not be analyzed if the case can be resolved under only one of them. See State v. Madrigal,87 Ohio St.3d 378, 389, 2000-Ohio-448, 721 N.E.2d 52; State v. Loza,71 Ohio St.3d 61, 83, 1994-Ohio-410, 641 N.E.2d 1082.