OPINION
{¶ 1} Defendant-appellant Robert Eli Adams appeals from his convictions of gross sexual imposition and attempted sexual battery which were entered in the Jefferson County Common Pleas Court after a trial to a jury. We are first presented with an issue concerning whether the court's addition to the standard Howard charge coerced the jury to reach a compromised verdict. We are then asked to determine whether the conviction of gross sexual imposition is against the manifest weight of the evidence. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF FACTS {¶ 2} On October 28, 2001, Jodi Guarino was at a bar in Steubenville with a friend. She left her car there and went with her friend to another bar around 11:00 p.m. (Tr. 269, 370). Adams was also at both bars. When Ms. Guarino's friend wanted to leave, she decided to stay and get a ride to her car from Adams whom she had just met. (Tr. 271, 374). Ms. Guarino said that she left the bar with Adams in order for him to drive her to her car. (Tr. 405). Adams' niece testified that she saw Adams leave the bar with Ms. Guarino around 1:30 a.m. A waitress said that she left at 2:00 or 2:30 a.m. and that Adams and Ms. Guarino left before she did. (Tr. 255). Adams told police that they went behind another bar to do cocaine but he did not want any. He also claimed that she made advances toward him, but because he was not in the mood, he drove her to her car around 3:00 a.m. (Tr. 225, 229-230). Yet, he told his niece that he dropped Ms. Guarino off at a truck stop where she "got what she deserved" from various other men.
 {¶ 3} Ms. Guarino testified that when she realized that Adams was not taking her to her car, she inquired where he was going. His demeanor changed, he told her to "shut the F up," he called her a "whore," he said she reminded him of his ex-wife, and he then claimed he was going to take her to a party to get high. (Tr. 377-379, 409, 412-413). According to Ms. Guarino's testimony, Adams drove across the bridge into West Virginia and then into Pennsylvania where he stopped in a wooded area. (Tr. 413).
 {¶ 4} According to Ms. Guarino, after Adams pulled the car over, he pulled down his pants and tried to force her head into his lap. (Tr. 380, 415). She fought back, and his attempt to force her to perform oral sex did not succeed. (Tr. 415). She testified that he then pushed her back into the seat, grabbed her throat, and attempted to pull up her skirt and pull down her nylons. (Tr. 380-381, 417). She felt weak from the pressure on her throat; still, she kept fighting, and he stopped. (Tr. 381). He allegedly apologized and said she was "not like the other girls." (Tr. 382, 418, 422). Ms. Guarino testified that Adams then asked her if she was going to "go to the law." (Tr. 382, 422). She responded in the negative out of fear of his reaction. He then drove her to her car, at which point she took down his license plate number. She then went to the police station at approximately 3:00 a.m. (Tr. 188, 386). Ms. Guarino's gold earring was later found in the driver's side armrest of his car. (Tr. 202, 208, 211).
 {¶ 5} On December 5, 2001, Adams was indicted in Case No. 01CR160 with the following counts: (1) kidnapping in violation of R.C.2905.01(A)(4), a second degree felony; (2) abduction in violation of R.C. 2905.02(A)(1), a third degree felony; (3) sexual battery in violation of R.C. 2907.03(A)(1), a third degree felony; and (4) gross sexual imposition in violation of R.C. 2907.05(A)(1), a fourth degree felony. On April 3, 2002, Adams was indicted in case No. 02CR69 for attempted rape in violation of R.C. 2923.02 and 2907.02(A)(2), a second degree felony. The cases were combined for the trial held from June 19 until June 21, 2002.
 {¶ 6} After hearing the testimony, the court entered an acquittal on sexual battery and instead instructed the jury on attempted sexual battery, a fourth degree felony. The jury found Adams not guilty of kidnapping, abduction, and attempted rape. However, Adams was found guilty of attempted sexual battery and gross sexual imposition. A sentencing hearing was held on June 28, 2002 at which the court sentenced Adams to fifteen months on each count to run consecutively for a total of thirty months. Adams filed timely notice of appeal.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 7} Appellant's first assignment of error contends:
 {¶ 8} "The trial court erred by refusing to grant the defense motion for a mistrial when the juror[s] announced they were hopelessly deadlocked and forced them into a compromised verdict so they could escape the jury room and further deliberations."
 {¶ 9} The Howard charge, which was formulated by the Supreme Court in State v. Howard (1989), 42 Ohio St.3d 18, provides:
 {¶ 10} "The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others.
 {¶ 11} "You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so.
 {¶ 12} "You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors." Id. at 25-26. (Paragraph breaks added).
 {¶ 13} In the case before us, the jury began deliberations at 3:05 p.m. on June 20, 2002. At 4:25 p.m., they were released for the night. (Tr. 517). At 9:00 a.m. the next morning, June 21, 2002, the jury reconvened for deliberations. (Tr. 526). At 11:45 a.m., after a total of four hours of deliberations, the jury sent a communication indicating, "We cannot come to a decision." (Tr. 526). The state asked for further instructions, and defense counsel asked for a mistrial. (Tr. 527). The court brought the jury into the courtroom and asked the foreperson whether they jury reached a decision on any of the counts. The foreperson responded that they had not. The court then sent the jurors to lunch. (Tr. 531). Thereafter, the court overruled the motion for a mistrial and advised that it would instruct as per Ohio Jury Instruction 415.50. (Tr. 532).
 {¶ 14} The court said that it would modify the instruction as to style but not substance. (Tr. 533). The court then read its proposed instruction to the attorneys. (Tr. 533-534). Defense counsel's only objection was regarding the order of those voting for acquittal and those voting for conviction. She wished the court to address those voting for conviction first. (Tr. 535). The state had no problem with this, and the court granted defense counsel's request. (Tr. 536). We note that, contrary to defense counsel's concern, the Supreme Court's ideal instruction itself speaks to those voting for acquittal before it speaks to those voting for conviction. Howard, 42 Ohio St.3d at 23. Regardless, the court granted counsel's request, and thus, appellant does not take issue with this on appeal.
 {¶ 15} Rather, on appeal, appellant contends that the court should not have modified the Howard charge. Specifically, appellant takes issue with the following statement, "If you are unable after a furtherreasonable period of deliberations to reach verdicts I will return you to the courtroom for a final resolution of the case. And the post script is I decide what's reasonable." (Tr. 534, 540) (Emphasis added to allegedly confusing and misleading words). Appellant claims that the jury was left to imagine what was the reasonable time period that must elapse before they would be "set free" and that this caused them to reach a compromised verdict in order to "escape."
 {¶ 16} In an attempt to avoid the doctrine of waiver due to defense counsel's failure to object on this ground below, appellant states that the court interrupted defense counsel when she was explaining her objections. However, in reading the pertinent portions of the transcript, this does not appear to be so. Rather, it seems clear that defense counsel voiced all of her concerns and was content with the court's response to those concerns. (Tr. 535-536, 538). "On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Civ.R. 51(A). In accordance, we need not address this assignment of error.
 {¶ 17} Regardless, jury instructions should not be dissected and examined piece-by-piece but should be reviewed as a whole in the proper context. State v. King (Mar. 22, 2000), 7th Dist. No. 95CA163, citingState v. Price (1979), 60 Ohio St.3d 136, citing Cupp v. Naughten
(1973), 414 U.S. 141, 146-147. Here, the jury instructions were proper as a whole. Moreover, this is not a case where the jury deliberated for two and one half days on an aggravated murder charge, received an encouragement instruction, and then returned with a guilty as charged verdict within the hour as in Howard. Rather, this jury had deliberated a mere four hours before receiving the instruction and then deliberated another one and one half hour, returning with three not guilty verdicts and two guilty verdicts on the two least serious crimes. See King, 7th Dist. No. 95CA163 (not finding a compromise verdict where King was convicted of one crime and acquitted of the other after a modifiedHoward charge).
 {¶ 18} In any event, the mention of a reasonable time was not coercive. It was in fact just a disclosure of the premise guiding the court. See Howard, 42 Ohio St.3d at 25 (noting the American Bar Association's proposal that a court shall not require or threaten the jury to deliberate for an unreasonable length of time and stating that it does not disapprove of this standard). Appellant's complaint, that the jury was misled into believing that reasonable could mean many days or months, is disingenuous. The fact that computation of a reasonable time is discretionary does not make the word coercive. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 19} Appellant's second assignment of error provides:
 {¶ 20} "The conviction for gross sexual imposition was against the manifest weight of the evidence."
 {¶ 21} Pursuant to R.C. 2907.05(A)(1), the relevant elements of gross sexual imposition are "hav[ing] sexual contact with another * * * [when] the offender purposely compels the other * * * to submit by force or threat of force." Sexual contact is defined in R.C. 2907.01(B) as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."
 {¶ 22} Because the "purposely compels submission by force or threat of force" element was satisfied by Ms. Guarino's testimony that appellant had her by the throat and was squeezing her throat so she could not breath, appellant only takes issue with the sexual contact element. More specifically, he contests the portion of the sexual contact definition which entails touching an erogenous zone. He contends that there is no indication that he touched an erogenous zone of Ms. Guarino. He states that her testimony may possibly support attempted gross sexual imposition; however, he urges that it does not support a completed act of gross sexual imposition. He notes that Ms. Guarino testified that he did not contact her "privates." (Tr. 381). Appellant claims that the issue revolves around the interpretation of the following testimony:
 {¶ 23} "he had me with one hand by the throat and the other hand was trying to get up my skirt and get in my hose. * * * So, like I said, with one hand I was trying to get his hand off my throat and with my other hand I was trying to stop his other hand from trying to get up my skirt in my hose.
 {¶ 24} "Q Did he make contact with — when he was trying to get his hand up your dress did he make any contact with your private area?
 {¶ 25} "A No.
 {¶ 26} "Q Did he make contact with your thighs? when you were fighting him off was he touching you?
 {¶ 27} "A Yeah, he was trying to get my skirt up and I guess trying to get to my hose to get my hose off." (Tr. 380-381).
 {¶ 28} Appellant argues that Ms. Guarino did not actually indicate that he touched her thigh because the prosecutor interjected another question after his question about her thigh before she could answer. However, appellant's reading of the above question and answer is too narrow. Her answer conveys that he contacted her thighs when he was trying to remove her nylons.
 {¶ 29} In any case, appellant fails to cite to other parts of the record, which further indicate that he touched her thigh. First, Ms. Guarino's pantyhose were admitted as state's exhibit 1. (Tr. 203, 436). They have a small tear on the right upper thigh area. (Tr. 203, 207). Ms. Guarino testified that Adams caused this tear when he was trying to remove them. Hence, the jury could believe this testimony and determine he touched her thigh. (Tr. 206). Additionally, on cross-examination, she further explained, "Trying to get up my skirt I guess to get my hose off. He was just pawing at me. * * * Yes, he was trying to get up my skirt, trying to get at my hose." (Tr. 418).
 {¶ 30} Further testimony by Ms. Guarino provides:
 {¶ 31} "Q And he's clutching at your dress and your pantyhose. Would it be fair to say where the tear was in those pantyhose is where he was making contact with you?
 {¶ 32} "A Yes. It was right here on my left thigh." (Tr. 433).
 {¶ 33} As such, appellant's argument that there is no indication that he touched her thigh is without merit. At this point, we mention that appellant's argument, which is labeled a weight argument in the assignment, actually vacillates between a sufficiency argument and a weight argument. We have distinguished the concepts multiple times since the Supreme Court's case of State v. Thompkins (1997), 78 Ohio St.3d 380.
 {¶ 34} In conclusion, there was sufficient evidence to support the element of touching her thigh. In particular, a rational trier of fact could find this element proven beyond a reasonable doubt when the evidence is viewed in the light most favorable to the state. See Statev. Goff (1998), 82 Ohio St.3d 123, 138.
 {¶ 35} Under a separate analysis, this finding was not against the manifest weight of the evidence. The jury could believe that Ms. Guarino's testimony was credible. See State v. DeHass (1967),10 Ohio St.2d 230, 231. In believing her claims, the jury did not clearly lose its way or create a manifest miscarriage of justice. See Thompkins,78 Ohio St.3d at 387. Thus, we shall not sit as the thirteenth juror and reverse the conviction of gross sexual imposition on the grounds raised. This assignment of error is overruled.
 {¶ 36} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Judgment affirmed.
Waite, P.J., and DeGenaro, J., concur.