[Cite as *State v. Popp*, 2017-Ohio-7432.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO                  :

                                   :

    Plaintiff-Appellee        :    C.A. CASE NO. 26971

                                   :

v.                            :    T.C. NO. 15-CRB-15

                                   :

CARL A. POPP              :    (Criminal Appeal from

                                   :     Municipal Court)

    Defendant-Appellant    :

                                   :

. . . . . . . . . .

# O P I N I O N

Rendered on the ___1st___ day of _____September_____, 2017.

. . . . . . . . . .

MICHAEL A. MAYER, Atty. Reg. No. 0064079, 510 West Main Street, Fairborn, Ohio 45324
    Attorney for Plaintiff-Appellee

JENNIFER E. MARIETTA, Atty. Reg. No. 0089642, 74 N. Orange Street, Suite 105, Xenia, Ohio 45385
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} On March 11, 2015, Carl A. Popp was charged by citation with one count of disorderly conduct, one count of criminal trespass, and one count of resisting arrest. The State dismissed the count of disorderly conduct before trial, and Popp was found guilty by a jury in the Oakwood Municipal Court of one count of criminal trespass; he was found

not guilty of resisting arrest. Popp was sentenced to 30 days in jail, but that sentence was suspended and Popp was placed on supervised probation for two years on the condition that he continue mental health counseling until released. He was also fined $250.

{¶ 2} Popp appeals from his conviction, raising four assignments of error.

### Sufficiency and Weight of the Evidence

{¶ 3} The first and second assignments of error assert that Popp's conviction was supported by insufficient evidence and was against the manifest weight of the evidence.

{¶ 4} An argument based on the sufficiency of the evidence challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Under a sufficiency analysis, an appellate court does not make any determinations regarding the credibility of witnesses. *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998), citing *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 5} In contrast, when reviewing an argument challenging the weight of the

evidence, the court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. " ' The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 6} Where an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient evidence. *State v. Million,* 2d Dist. Montgomery No. 24744, 2012-Ohio-1774, ¶ 23; *State v. Combs,* 2d Dist. Montgomery No. 19853, 2004-Ohio-2419, ¶ 12.

{¶ 7} Criminal trespass, as charged in this case, is defined as "[b]eing on the land or premises of another and negligently failing or refusing to leave upon being notified by signage posted in a conspicuous place or otherwise being notified to do so by the owner or occupant, or the agent or servant of either." R.C. 2911.21(A)(4).

{¶ 8} The State's evidence at trial was as follows:

{¶ 9} Paul Waller, the principal of Oakwood High School, testified that he learned of a "disciplinary situation" at the school involving Popp's son in early March 2015. Believing that the situation had been resolved by a teacher, Waller did not take any action until he received an email from Popp asking for a meeting. Waller then investigated the situation further by talking with the teacher and some of the other students involved, which confirmed Waller's view that no disciplinary action was needed. Waller agreed with the teacher that it had been resolved and had been "a good learning experience" for Popp's

son.

**{¶ 10}** Popp's email to Waller indicated that he (Popp) wanted to know the details of his son's "interrogation" and what other students had said about his son. Waller responded to Popp by email, indicating that Popp had "misinformation" about his son's being in trouble, but Waller also forwarded the emails to his secretary and asked her to set up a meeting with the Popps.

**{¶ 11}** On March 11, 2015, Waller met with Popp, his wife Tammy,[1] and their son in Waller's office. According to Waller, Waller began the meeting by asking Popp's son to explain what had happened; the son's version was consistent with what Waller had been told by the teacher. Tammy expressed some confusion about why they were meeting, apparently not understanding that Popp had requested the meeting. Popp then said he needed to speak to his wife outside, and Popp and Tammy briefly left the room.

**{¶ 12}** When Popp and Tammy returned, Popp asked for the names of the students who had said something to the teacher about his son. Waller refused to share this information, stating that the students had been concerned about their safety and had gone to an adult with their concerns, as they were taught to do. Popp was unsatisfied with this response, and made a comment to his son indicating, "That's the kind of answer you get from the one percent." Waller then tried to conclude the meeting. Waller asked Popp's son to go back to class, but Popp told his son not to leave because they were not done. Waller said to Popp, "You need to go," but Popp said, "We're not leaving." Waller then informed Popp that he (Waller) was going to call the Oakwood Safety Department if Popp did not leave. Popp said, "Go ahead. I want to press charges on you." Waller had

---

[1] We will use Mrs. Popp's first name to avoid confusion.

no idea what Popp was referring to, but informed Popp that he could press charges over at the Safety Department. Waller then instructed his secretary to call the Safety Department because the Popps would not leave his office.

{¶ 13} According to Waller, Waller walked toward Popp's son with his arms extended to encourage the son to return to class, but Popp "knocked" his arms down and said, "Don't touch my son." Waller testified that he was trying to spare the son from embarrassment as a result of the encounter. By the time an officer arrived, Waller had asked the Popps to leave his office four or five times.

{¶ 14} Waller testified that Oakwood Police Officer Upchurch entered the principal's office and also asked Popp to leave. According to Waller, Upchurch was not "especially aggressive"; Upchurch stated to Popp that the principal had asked him (Popp) to leave and he (Popp) needed to leave. Popp responded, "It's not that simple." Upchurch stated, "Yes it is," and threatened to arrest Popp. Tammy started to gather her things, but Popp instructed her to stay in her seat. Popp also refused to get up from his chair and shook his head. Upchurch asked Popp to leave five or six times before trying to arrest Popp.

{¶ 15} Waller further testified that, when Upchurch tried to put Popp's hands behind his back to arrest him, Popp "ripped his arm away [from Upchurch] real hard." Upchurch drew his Taser, and Tammy started yelling. Popp had his hands out but refused to put them behind his back; he "actively mov[ed] his arms away from the officer" and was clenching his fists. According to Waller, Popp did not mention any injury that would have prevented him from putting his arms behind his back. Popp was eventually handcuffed, and another officer arrived to assist Upchurch.

**{¶ 16}** Vicki Roberts, Waller's assistant and secretary, has a desk outside Waller's office. She testified that she knows Popp, because he has had four children come through Oakwood schools. Prior to the day on which Popp was arrested, a teacher came into the office with Popp's son during the school day; they were looking for Waller, because something had happened in the teacher's class, and she wanted to include Waller in the conversation. However, Waller was not in the office at that time. As such, the teacher sat with Popp's son in the office for 10 minutes in quiet conversation. The teacher and Popp's son then went back to class. The teacher asked Roberts to tell Waller that they had come to see him, but to tell him that "we're fine."

**{¶ 17}** Waller subsequently got an email from Popp asking Waller to schedule a meeting. Waller forwarded his response to Roberts and asked her to schedule the meeting, which she did, for Wednesday, March 11, 2015 at 9:00 a.m.

**{¶ 18}** The day of the meeting, Popp arrived with his wife and son, and they went into the principal's office. According to Roberts, five minutes after the meeting started, Popp and his wife came out of Waller's office and went into the supply room. Popp was loud and told Tammy to "shut [her] mouth." After about 30 seconds, they returned to Waller's office.

**{¶ 19}** Ten to fifteen minutes later, Waller came out of his office and asked Roberts to call the police. She heard him ask the family to leave, say that the meeting was over, and tell them that they needed to leave. Roberts called the police on the non-emergency number, and an officer arrived in about three minutes. Roberts testified that Waller encouraged the Popps' son to return to class, but said that Waller was not angry or agitated when he spoke with the boy.

{¶ 20} After the police officer arrived, he also told Popp more than one time that he needed to leave; he threatened to arrest Popp if he did not leave. Popp was arrested inside the office as Popp yelled obscenities at the officer. However, Popp was no longer yelling when he was escorted out in handcuffs.

{¶ 21} Roberts did not hear the police officer threaten to stun Popp with a Taser, and she did not observe his resisting arrest while being put in handcuffs.

{¶ 22} Oakwood Public Safety Officer Bruce Upchurch testified that, when he responded to the Oakwood High School principal's office on March 11, 2015, the principal informed him that he (Waller) wanted the Popps out of his office and they refused to leave. The family was seated in Waller's office at that time. According to Upchurch, when Upchurch told the family it was time to leave, Tammy stated, "It's not as simple as that," and tried to argue with him. Upchurch kept repeating that it was time to go. Popp demanded a business card from Upchurch, which Upchurch refused to provide; Popp ignored Upchurch's requests and showed no sign of leaving. When Upchurch tried to handcuff Popp behind his back, Popp made his arms rigid and stiff. After refusing multiple commands to put his hands behind his back, Popp claimed to have a war injury; however, Popp never complained about his shoulder again. After Popp was handcuffed, Upchurch was joined by Officer Sarah Martin, and they walked Popp out of the building together. According to Upchurch, he used two sets of handcuffs on Popp, because Popp was a large man.

{¶ 23} Popp, his wife, and his son testified in Popp's defense. The son testified that "false accusations" had been made against him at school, and his parents were concerned that he was being bullied. Describing the meeting with Principal Waller,

Popp's son testified that, when his parents briefly stepped out of the principal's office, Waller acted like he "had a better place to be," was agitated, and asked why the son had involved his parents. The son testified that, later in the conversation, when things got "a little more heated," Waller "grabbed [him] by the arm" and tore his shirt. The son testified that Popp (his father) encouraged Waller to call the police because Waller had "just assaulted [his] son."

{¶ 24} Popp's son testified that when the police officer arrived, the officer spoke "in a very hostile manner." He also testified that his parents could not comply with the officer's order to leave the principal's office, because Waller was standing in the office doorway. When the officer pulled his Taser out, the son said, "What the hell are you doing?" and tried to distract the officer by yelling, because he (the son) did not know if his father could "survive" getting stunned. Popp told his son to "stand down" and "remember [his] training," which the son described as a military term that meant to "stop all the vocal movement and anything that can be hostile." He testified that his mom complained about the officer's handcuffing Popp behind his back because of past shoulder injuries, and that the officer had only used one set of handcuffs on his father.

{¶ 25} Tammy Popp testified that the meeting with Principal Waller had started very calmly, but there came a time when her complaints about the welfare and safety of her son were not being taken seriously and Waller was being "sarcastic." When Tammy raised her voice, Popp took her outside the principal's office and described to her a conversation he had had with "Captain Jones," in which Jones instructed the Popps to "just go in [to the meeting with Waller] and shut your mouth and just hear what he [Waller] has to say, and then take your frustrations out on Captain Jones." (It later became clear

during Popp's testimony that Captain Jones was a member of the Oakwood police department.) They then reentered Waller's office. When Waller acted like he did not care and had better things to do than deal with the Popp family, Popp said to his son, "There's your one percent."

{¶ 26} According to Tammy, Waller got angry and said that the meeting was over. Waller then grabbed the Popps' son by the shoulder and arm and pulled him, ripping the son's shirt. At that point, Tammy started screaming that Waller had assaulted her son. Waller ordered the Popps to leave his office or he would call the police. Popp encouraged Waller to call the police, asserting that Waller had just assaulted his son. Waller told his secretary to call the police.

{¶ 27} When the officer arrived at the office, Tammy stated that she wanted to file charges against Waller, but the officer refused to do anything at the principal's office, saying they could file a report at the police station. In the midst of this conversation, the officer arrested Popp, but the officer would not state what offense was the basis for the arrest. According to Tammy, the police officer started poking Popp with a Taser for no reason, and their son started screaming, "What are you doing to my dad?" The officer then put his Taser away and started to handcuff Popp, asking why Popp was resisting; Tammy attempted to explain that Popp could not comply with the officer's orders to put his arm back because of a prior injury. Tammy testified that the officer "snapped" Popp's arms back to handcuff him and used only one set of cuffs.

{¶ 28} Tammy acknowledged that both the principal and the police officer had told them to leave the principal's office, but she claimed that the principal had blocked them from leaving the office.

**{¶ 29}** Popp testified that he considered himself an "activist" regarding the bullying of his children. Popp said that, when he heard about the allegations other students had made about his son, he requested a "meet and greet" with Waller, the teachers, the guidance counselor, and the superintendent, to show "cohesion" between Waller and Popp. Popp stated that he had to contact the superintendent in order to get the meeting set up. Popp also testified that, prior to his meeting with Waller, he also talked with Captain Jones, a senior captain of the Oakwood Police Department and "[h]opefully the next Chief of Police," who had handled previous issues regarding bullying of the Popp children. Jones encouraged Popp to talk with Waller.

**{¶ 30}** Popp testified that, during the meeting with Waller, Waller was "agitated," "annoyed," and distracted; Waller also expressed to Popp's son his (Waller's) belief that the issue was resolved and that the son was not being punished for anything. According to Popp, he stepped out of the office briefly to remind his wife that they could "get support" from Captain Jones if the meeting did not go well, and he told Tammy to "shut up and listen." The parents expressed disagreement with Waller that the issue was resolved, but Waller refused to give them the names of the children who allegedly bullied their son or to offer counseling. Waller told the Popps that their son did not have any rights "unless I [Waller] give them to him." Popp then commented to his son about "the one percent," referring, he said, to the one percent that is put in charge of society by the other 99%, and they "abuse that power and do not exercise their leadership the way they are supposed to follow guidelines." Waller then said he did not care about this situation and that the Popps should go to court if they did not like the way he handled it.

**{¶ 31}** According to Popp, Waller walked around his desk, grabbed Popp's son's

shoulder, and lifted him out of his seat, ripping his shirt. Tammy and Popp both told Waller to get his hands off their son. Waller then stated that the meeting was over and asked if he needed to call the police. Popp answered affirmatively, because Waller had "just assaulted [his] son." Popp testified that, while they were waiting in Waller's office for the police to arrive, Waller stated, "you're paranoid" and "you've raised your kids wrong"; the Popps argued with Waller about these statements.

{¶ 32} When the police officer arrived, he ordered everyone out of the principal's office. Popp testified that Tammy argued that the matter was "not that simple," and the son asked the police officer for a business card. The officer (Upchurch) replied to the Popps that "it's not going to be done in this office," and that they would need to go to the police department to file a report. According to Popp, he and his wife were fine with this approach, referring to Waller's office as a "crime scene" because hands were put on his son there and stating that "holding fast * * * was no longer necessary."

{¶ 33} Popp testified that his wife could not leave the office because Waller was blocking her way. He also stated, with regard to being arrested, that he could not "bend [his] arm * * * as quickly as [Upchurch] was wanting because of injury in [his] shoulder." Popp stated that the officer had already put him in "a takedown position" restricting his movements, which Popp had believed was unnecessary. The officer had also pulled out his Taser. Popp stated that his "two rotor cups popped backwards" as Upchurch brought Popp's arms behind his back, causing him pain. Popp also stated that he had no intention in his mind of resisting arrest and tried to comply with the officer's orders "[o]ne hundred percent."

{¶ 34} On cross-examination, Popp testified that it was "typical procedure" for his

family to audio or video record meetings in which they were involved, and that his son typically records his conversations with his teachers outside of class. Popp had asked Captain Jones whether he should record his upcoming meeting with Waller; Jones had encouraged him not to do so, instead to "listen" and "just shut up." Popp stated that he did not tell either of the officers that the handcuffs were hurting him as they walked out and placed him in the cruiser, because he was "not focus[ed] on comfort"; "surviving" was his primary concern at that time. He testified that he did not mention this issue at the jail either.

{¶ 35} Based on the evidence presented, the jury could have reasonably credited the testimony of the State's witnesses that Principal Waller and Officer Upchurch told Popp to leave the school premises and he refused to do so. Indeed, Popp and his wife admitted in their testimony that they had been asked to leave but had refused to do so. They continued to argue with Waller and claimed that they had been justified in remaining while the police were called, because of what they perceived to be Waller's own misconduct, and they argued with Upchurch after his order to leave because they felt that they should be able to raise their complaints against Waller at that time. Although the Popps asserted that Waller had prevented them from leaving by standing in their way, Waller and his secretary contradicted these claims, and it was for the jury to weigh the credibility of the witnesses. Moreover, the jury could have reasonably concluded from Waller's testimony about his responsibilities and the Popps' presence in his office that he (Waller) was authorized to order them to leave, even if they were initially privileged to be on the premises. The jury did not clearly lose its way or create a manifest miscarriage of justice in concluding that Popp had refused both the principal's and the police officer's

requests and orders to leave the principal's office. Because the conviction of criminal trespass was not against the manifest weight of the evidence, it was necessarily based on legally sufficient evidence.

{¶ 36} The first and second assignments of error are overruled.

### *Jury Instructions*

{¶ 37} In his third assignment of error, Popp argues that the jury instructions were "confusing and inadequate." He contends that there were "many pauses and mid-sentence corrections," that the definition of criminal trespass was misstated at one point, and that the element of privilege "was glossed over."

{¶ 38} When reviewing a trial court's jury instructions, an appellate court must consider the instructions as a whole, rather than viewing an instruction in isolation, and then determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights. *State v. Crawford,* 2d Dist. Montgomery No. 22314, 2008-Ohio-4008, ¶ 36, citing *Becker v. Lake Cty. Mem. Hosp. West,* 53 Ohio St.3d 202, 560 N.E.2d 165 (1990). An appellate court will not reverse a conviction due to an erroneous jury instruction unless the error was so prejudicial that it might have induced an erroneous verdict. *Id.; Hayward v. Summa Health Sys./Akron City Hosp.,* 139 Ohio St.3d 238, 2014-Ohio-1913, 11 N.E.3d 243.

{¶ 39} Popp claims that "privilege" was not adequately explained to the jury. However, the State did not claim that Popp entered the premises without privilege; it was undisputed that he entered the school to attend a meeting that had been arranged by the principal at Popp's request. Thus, the only question was whether he had a privilege to remain after he had been asked to leave.

{¶ 40} The court gave the following definition of privilege in the context of criminal trespass:

> \* \* \* What does privilege mean?   \* \* \* [I]t means an immunity, a license or right conferred by law, bestowed by express or implied grant, or arising out of status, position, office or relationship, or growing out of necessity.   That's a privilege.

This instruction tracks the definition set forth at R.C. 2901.01(A)(12).   Popp did not object to this definition or ask the court to expand upon it, and we reject Popp's argument that the court's use of the statutory definition of privilege, without further explanation, was plain error.

{¶ 41} As for Popp's other complaint about the jury instructions, we acknowledge that the trial court's jury instructions were not delivered smoothly.   For example, the first definition of "criminal trespass" read by the court was the definition contained at R.C. 2911.21(A)(1) ("knowingly enter or remain on the land or premises of another"), rather than R.C. 2911.21(A)(4) , under which Popp was charged (being on the land or premises of another, negligently fail or refuse to leave upon being notified to do so by the owner or occupant, or the agent or servant of either).   At another point, the court mingled the definitions of criminal trespass and resisting arrest by mentioning "recklessly or by force" in the context of remaining on the land or premises or another.   The judge also left the bench at one point during the jury instructions to retrieve the instruction on recklessness, which had been left in another room.

{¶ 42} However, the court gave the correct instruction on criminal trespass at least two times, and the verdict form contained the correct definition as well.   The court

also provided written definitions to the jury; those definitions are not part of the record before us, but the record contains no suggestion that counsel did not review those definitions or that the written definitions were incorrect. Two bench conferences were held during the course of the jury instructions, but they were not made a part of the record, and we cannot speculate about what was discussed. The parties' closing arguments also focused very clearly on the relevant definition of criminal trespass, with the key factor being if, when, and how the privilege to be on school property could be revoked and was or was not revoked in this case.

**{¶ 43}** Although there were some irregularities in the delivery of the jury instructions, the jury was presented by the court with the proper instruction on criminal trespass multiple times orally and in written form, including on the verdict form. We cannot find that the jury based its verdict on an improper definition of criminal trespass, or that the trial court's jury instructions unduly confused or misled the jury and led to an erroneous verdict. *Crawford,* 2d Dist. Montgomery No. 22314, 2008-Ohio-4008, ¶ 36.

**{¶ 44}** The third assignment of error is overruled.

### *Ineffective Assistance of Counsel*

**{¶ 45}** In his fourth assignment of error, Popp contends that his attorney's ineffectiveness denied him a fair trial. Specifically, Popp argues that his attorney did not timely object to two lines of questioning that may have been prejudicial to him and that, when the objections finally came, counsel did not request an instruction that the jury disregard the objectionable questioning.

**{¶ 46}** To establish ineffective assistance of counsel, Popp must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and

that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the trial would have been different. *See Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 47} The first line of questioning related to Popp's habit of audio and/or video recording conversations with public officials and others. This topic first arose on direct examination of Popp, when he indicated that he had asked Captain Jones before his meeting with Waller whether he (Popp) should "go in there and do the audio tape and the videotape and the documentation like we always do?" (Jones apparently discouraged Popp from doing so.) When questioned on cross-examination about whether he had been prepared to record the meeting with Waller, Popp responded, "That's typical procedure for us." He also stated that this was a practice Popp had encouraged with his children, including audio and videotaping their interactions with teachers outside of classroom instruction. There was no objection to these questions.

{¶ 48} Next, the prosecutor asked Popp on cross-examination whether he described himself as an activist regarding bullying issues. Popp answered affirmatively, adding that he was a concerned parent. The State then asked whether Popp was an "activist" with respect to other issues with which he was affiliated. The prosecutor mentioned "anonymous affiliated groups" and asked if Popp posted video to certain types of websites. No explanation was given about these websites, nor was the nature of the "anonymous affiliated groups" made clear. The prosecutor asked whether Popp had

recorded a video at a restaurant "very soon after" the incident at the school and had then posted the video on YouTube. Popp indicated his awareness that such a video was on YouTube, but he denied that he had posted it. Defense counsel objected to any further discussion of this video, and a bench conference was held off the record.

{¶ 49} Back on the record, the court sustained defense counsel's objection. The questioning then returned to whether Popp had recorded other interactions with teachers, school administrators, or police officers. Popp denied that he had done so, but he indicated an awareness that other members of his family had made such recordings. When asked whether he had recorded his interactions with members of the public, defense counsel objected based on relevance, and the objection was sustained. The court commented that recordings of meetings with city and school officials "might be relevant," but questions about recording interactions with members of the public were not.

{¶ 50} In our view, Popp had opened the door to questions about recording conversations with school and city officials on direct examination; the prosecutor's exploration of this issue on cross-examination, which was fairly brief, was not improper, and the court, within its discretion, could have overruled an objection to such questions. As such, counsel was not ineffective in failing to object to these questions. With respect to Popp's anonymous "affiliations" and any posting of these groups' videos to YouTube, these references were very ambiguous, and counsel quickly objected to this line of questioning. Moreover, the court instructed the jury to disregard "statements or objections" that were "stricken" because an objection was sustained. We are unpersuaded that these questions had any impact on the jury's verdict or that, if counsel had objected more quickly, there is a reasonable probability that the outcome of the trial

would have been different.

**{¶ 51}** The fourth assignment of error is overruled.

***Conclusion***

**{¶ 52}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.

Copies mailed to:

Michael A. Mayer
Jennifer E. Marietta
Visiting Judge, Oakwood Municipal Court