[Cite as *State v. Kronenberg*, 2018-Ohio-1962.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106118**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**MICHELLE KRONENBERG**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-614825-A

**BEFORE:** Jones, J., E.T. Gallagher, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 17, 2018

**ATTORNEYS FOR APPELLANT**

Mark A. Stanton
Cuyahoga County Public Defender

Jeffrey Gamso
Assistant County Public Defender
310 Lakeside Avenue, Suite 200
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Jillian Eckart
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant Michelle Kronenberg ("Kronenberg") appeals her menacing by stalking convictions that were rendered after a bench trial. She also challenges the trial court's imposition of consecutive sentences. For the reasons that follow, we affirm.

**Procedural History**

{¶2} In February 2017, Kronenberg was charged with three counts of menacing by stalking in violation of R.C. 2903.211(A)(1). The indictment charged that the offenses occurred on February 22, 2017, and there was a count for each of the three victims: James LaMarca (Count 1), Mary Jo LaMarca (Count 2), and Alysse LaMarca (Count 3). All three counts contained

"furthermore" clauses, that alleged that Kronenberg "trespassed on the land or premises where the victim lives, is employed, or attends school."

{¶3} The state filed a notice of intent to use other acts evidence pursuant to Evid.R. 404(B). After competency issues were addressed, Kronenberg waived her rights to both counsel and a jury trial, and the matter proceeded to a bench trial with Kronenberg representing herself with stand-by counsel. After its deliberation, the court found Kronenberg guilty as indicted. The court sentenced her to the maximum term of 18 months for each count and ordered that the sentences be served consecutively. Kronenberg now appeals and presents the following assignments of error for our review:

> I. The evidence was insufficient to convict Ms. Kronenberg on Count 1 of the indictment because there was no evidence that any action by Ms. Kronenberg would knowingly cause James LaMarca to believe that she would cause him physical harm or mental distress.
>
> II. The evidence was insufficient to convict Ms. Kronenberg on Counts 2 and 3 of the indictment because there was no evidence of a "pattern of conduct" on her part in relationship to the alleged victims of those counts.
>
> III. The evidence was insufficient to convict Ms. Kronenberg of menacing by stalking because none of the alleged victims [were] aware of any "pattern of conduct" that would cause them to believe that she would cause any [of] them to suffer physical harm or mental distress.
>
> IV. The trial court did not make the findings necessary to support the imposition of consecutive sentences.

## Background and Other Acts Evidence

{¶4} James and Mary Jo LaMarca are husband and wife, and Alysse is their adult daughter; at all relevant times, they resided together in Mayfield Heights. All three testified at trial.

{¶5} Kronenberg and James LaMarca met in the late 1980's, early 1990's, when

Kronenberg worked for James's funeral home business. Kronenberg did telemarketing for the business, soliciting people to prearrange their funerals. Approximately one year into her employment with the business, however, the telemarketing program was eliminated, and Kronenberg lost her job.

{¶6} Initially, James and Kronenberg kept in touch. James testified that they were "friends"; he never had any romantic interest in Kronenberg, but she confided a lot of her personal problems to him. They would communicate via each other's cell and home phones, as well as by email. James testified that Kronenberg's contact with him eventually got excessive; for example, at times she called him "hundreds of times" during the course of one day, and would write page-long "rambling" emails.

{¶7} James testified that in 2000, he told Kronenberg not to call him anymore, and that request made Kronenberg upset. Kronenberg did not honor the request, however, and she would call James's cell and home numbers as well as the funeral home number.[1] After this point in time, the LaMarca family's interactions with Kronenberg were what they described as "harassing" and "scary" and led them to seek legal intervention.

{¶8} In 2003, James sought and was granted, through the Lyndhurst Municipal Court, a no-contact order for himself, Mary Jo, and Alysse. The order was effective for one year. When the order expired, Kronenberg started contacting James again.

{¶9} In 2008, Kronenberg was sentenced to two years of community control sanctions for seven counts of telecommunications harassment of the LaMarca family. *See* Cuyahoga C.P. No. CR-08-508145. Shortly after she was sentenced, Kronenberg violated the sanctions and

---

[1]James testified that his cell and home numbers were tied into his business and that he maintained those numbers during the years he was having difficulties with Kronenberg.

was sent to Northcoast Behavioral Health Care for six months.

{¶10} In March 2010, James sought and was granted a civil protection order for himself and his family. Kronenberg was arrested in September 2010, after she went to the LaMarca's house. She was convicted of violating the protection order, telecommunications harassment, and criminal trespass, and was sentenced to a three-year prison term. *See* Cuyahoga C.P. No. CR-11-548068. Upon her release in 2013, Kronenberg contacted the LaMarca family and was sentenced to another three-year prison term. *See* Cuyahoga C.P. No. CR-13-579027.

{¶11} Kronenberg was released from prison on February 19, 2017. James testified that on February 21, 2017, she called his cell phone approximately 11 times. He did not tell Mary Jo and Alysse about the calls. Then, on February 22, 2017, at approximately 12:30 a.m., Kronenberg showed up at the LaMarca residence.

{¶12} Alysse testified that she was awakened by the ringing doorbell and "pounding" on the door of their home. She was "extremely frightened, panicked, scared [and] had no idea what was happening * * *." She woke her parents up, and her mother called the police. She did not initially know it was Kronenberg who was at the door, and when she learned that it was her, she became "extremely upset" and "frightened" because of the family's past dealings with Kronenberg.

{¶13} Alysse had been subject to Kronenberg's behavior for the past 16 years, and during that time, she received threats from Kronenberg when she would call the LaMarca's house and Alysse would answer the phone. Kronenberg would also send emails to the family's email address. Alysse testified that Kronenberg's continued contacts with her and the family were "extremely stressful." She told the court that whenever the family had to deal with Kronenberg, "[w]e don't talk, we fight, none of us sleep. It just causes a lot of tension."

{¶14} Mary Jo likewise testified as to the stress Kronenberg has caused for the family. She testified that she was scared of Kronenberg, who had previously threatened to "take her out," and as was the case with her past interactions with Kronenberg, Mary Jo was scared when she showed up at their house on February 22. Mary Jo summed up the family's involvement with Kronenberg as follows: "It's been awful. It's caused me personally great anxiety, my family great anxiety. We are, you know, we're just — we're scared. We're on edge when she's out [of prison or confinement]. She has done nothing but wreak havoc in our lives."

{¶15} James testified that all of his and his family's interactions with Kronenberg after he attempted to end contact with her left him feeling concerned for the safety of his family. He testified that dealing with the situation for over 15 years has caused him a great deal of mental distress.

{¶16} Kronenberg also testified at trial. She explained that her contact with James after he told her he did not want to be involved with her anymore was only because she needed help and she believed he was a loyal friend.

{¶17} In regard to the incident involved in this case, Kronenberg testified that her father purchased a Greyhound bus ticket for her to get to Cleveland after her release from prison. Her father picked her up from the bus stop, drove her to a Comfort Inn, and got a room for her for one night. She explained that living with her father was not an option because he was orthodox Jewish, she was not religious, and that created difficulties. Kronenberg also testified that she had been subject to a no-contact order with her father and she was unsure if it was still effective at the time.

{¶18} According to Kronenberg, when she was released from prison she was not given any information about the conditions of her postrelease control. She attempted to contact the

court and her parole officer, but was unsuccessful. So she decided "worst case scenario if I can't get into a courtroom, I am going to call Jim [LaMarca]. She tried calling him; he hung up on her the first time and then did not answer his phone after that.

{¶19} After checking out of the Comfort Inn, Kronenberg went to her father's house. He let her in, left the house, and returned shortly thereafter with the police. The police told her that she needed to go to a homeless shelter. The police transported her there, but Kronenberg testified that she would rather be in prison than in the homeless shelter. Feeling as if she were out of options, Kronenberg decided to go to the LaMarca's house because she knew she would get arrested and that would at least get her into a court where she could air her grievances. Or, alternatively, she thought James would be willing to talk to her and "figure things out."

{¶20} The officer who responded to the LaMarca's house testified that James, Mary Jo, and Alysse were all "very upset" when they learned that it was Kronenberg who was at their home.

**Law and Analysis**

**Sufficiency of the Evidence**

{¶21} In Kronenberg's first three assignments of error, she challenges the sufficiency of the evidence. "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 49 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the [fact finder] or whether evidence is legally sufficient to support the [fact finder's] verdict as a matter of law." *State v. Draper*, 7th Dist. Jefferson No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

**{¶22}** When reviewing a conviction for sufficiency of the evidence, a reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390. The evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no rational factfinder could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

**{¶23}** Kronenberg was convicted of menacing by stalking under R.C. 2903.211(A)(1), which provides in relevant part that,

> [n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

**Sufficiency of Evidence as to James LaMarca**

**{¶24}** In her first assignment of error, Kronenberg contends that the evidence was insufficient to establish that she knowingly caused James to believe that she would cause him physical harm or mental distress. She relies on the following question she posed to James at trial and his response:

> Q. And at any time in the almost 29 years that we've known each other, did you ever believe that I would knowingly cause you physical harm or mental distress?
>
> A. No.

**{¶25}** James indicated elsewhere in his testimony, however, that his dealings with Kronenberg caused him mental distress. For example, he testified that he has lost a lot of sleep over this, and that Kronenberg was "driving us crazy." Mary Jo and Alysse testified as well as to the emotional toll that Kronenberg's behavior has had on all of them. Thus, even if James

was not in fear for his life because of Kronenberg's behavior, there was sufficient other testimony about the mental distress it caused him, which was sufficient evidence to support the conviction in Count 1.

{¶26} In regard to physical harm, James's testimony was that he did not fear for his own physical safety, but he did fear for his wife and daughter's physical safety because of the threats Kronenberg had made against them over the years. Kronenberg contends that, although the menacing by stalking statute prohibits a person from "knowingly causing another person to believe that the offender will cause physical harm to the other person or a family or household member," she cannot be convicted under that portion of the statute because Count 1 only related to James; it did not include the "a family or household member" language.

{¶27} Under Crim.R. 7(B), an indictment may be made in ordinary and concise language; it does not have to verbatim mirror the statutory provision. Further, under Crim.R. 12(C) and 12(H), alleged defects in an indictment must be asserted before trial or they are waived. Kronenberg did not raise any defect in the indictment prior to trial. But the issue is moot because, as already mentioned, there was sufficient evidence that James suffered mental distress because of Kronenberg's actions.

{¶28} The first assignment of error is overruled.

**Sufficiency of the Evidence as to Mary Jo and Alysse LaMarca**

{¶29} In her second assignment of error, Kronenberg contends that the convictions in Counts 2 and 3 relative to Mary Jo and Alysse, respectively, were based on insufficient evidence because the state failed to present evidence that she had a "pattern of conduct" toward them. She relies on the definition of "pattern of conduct," which states that it is "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of

those actions or incidents * * *."    R.C. 2903.211(D)(1).

{¶30} Kronenberg contends that because her last contact with Mary Jo and Alysse prior to this incident was in 2013, which was admitted by the LaMarcas, the state failed to prove two or more actions or incidents closely related in time.   She relies on the testimony that James did not tell Mary Jo or Alysse about Kronenberg repeatedly calling him the day before she went to the LaMarcas' house.   Thus, according to her reasoning, there was only one incident involving Mary Jo and Alysse.   We disagree.

{¶31} R.C. 2903.211 does not specifically state what constitutes incidents "closely related in time."   Thus, whether incidents should be deemed closely related in time should be resolved by the trier of fact "'considering the evidence in the context of all the circumstances of the case.'"   *Middletown v. Jones*, 167 Ohio App.3d 679, 2006-Ohio-3465, 856 N.E.2d 1003 (12th Dist.), ¶ 10, quoting *State v. Honeycutt*, 2d Dist. Montgomery No. 19004, 2002-Ohio-3490, ¶ 26, citing *State v. Dario*, 106 Ohio App.3d 232, 238, 665 N.E.2d 759 (1st Dist.1995).

{¶32} The evidence in this case demonstrated that Kronenberg harassed the LaMarca family for over 15 years, with reprieves for them only when Kronenberg was either imprisoned or confined; she did not contact the LaMarcas during those periods of time because she was unable to do so.   But once she was no longer imprisoned or confined, she returned to harassing them again.

{¶33} On this record, the trial court did not err by considering Kronenberg's prior history, which resulted in numerous court proceedings, and using it to find a pattern of conduct.   *See Middletown* at ¶ 11 (viewing the defendant's actions over the course of the prior four years showed "overwhelming evidence of his pattern of conduct").

{¶34} In light of the above, the second assignment of error is overruled.

**Sufficiency of Evidence: Pattern of Conduct**

{¶35} For her third assigned error, Kronenberg contends that the evidence was insufficient to demonstrate a pattern of conduct because when she went to the LaMarcas' house and rang the doorbell and pounded on the door, none of the LaMarcas were initially aware that she was the person at their home. According to her, because of their unawareness, they were not disturbed by *her* having done that as part of any pattern of *her* conduct, until the police arrived and told them that it was she who disturbed their sleep." (Emphasis sic.). We are not persuaded.

{¶36} The record demonstrates that the LaMarca family lived in fear of Kronenberg contacting them. That they did not initially know it was Kronenberg at their home was inconsequential. They all testified that they were scared and concerned when they heard the pounding on their door — so much so that they felt it necessary to contact the police. Their fear and concern only deepened when they learned that Kronenberg was the perpetrator. Thus, there was sufficient evidence that Kronenberg engaged in a pattern of conduct toward the LaMarcas.

{¶37} The third assignment of error is overruled.

**Consecutive Sentences**

{¶38} For her final assignment of error, Kronenberg challenges the trial court's imposition of consecutive sentences.

{¶39} R.C. 2929.14(C)(4) provides that a trial court may impose consecutive sentences if the court finds that the consecutive service is (1) necessary to protect the public from future crime or to punish the offender, and (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Additionally, the trial court must find that at least one of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶40} In *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, the Ohio Supreme Court held that: "[i]n order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *Id.* at syllabus.

{¶41} In sentencing Kronenberg, the trial court stated that "consecutive sentences are warranted here to protect the public. There's no way around it that consecutive sentences aren't necessary based on this record of noncompliance [that has] continued over a decade-long obsession with the victims in this case."

{¶42} The court's sentencing entry states the following in regard to the imposition of consecutive sentences:

The court imposes prison terms consecutively finding that consecutive service is necessary to protect the public from future crime or to punish defendant; that the consecutive sentences are not disproportionate to the seriousness of defendant's conduct and to the danger defendant poses to the public; and that defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the defendant.

{¶43} This record supports the trial court's imposition of consecutive sentences. We recognize that the trial court did not recite the exact words used in the statute. But it is well

established that "a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 29.

**{¶44}** The fourth assignment of error is therefore overruled.

**{¶45}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., JUDGE

EILEEN T. GALLAGHER, P.J., and
SEAN C. GALLAGHER, J., CONCUR